2015 WY 73

**In the Interest of GC, a Minor Child.**

**KC, Appellant (Respondent),**

v.

**The STATE of Wyoming, Appellee (Petitioner).**

No. S–14–0247.

Supreme Court of Wyoming.

May 20, 2015.

Representing Appellant: Jacqueline K. Brown, Attorney at Law, Casper, Wyoming.

Representing Appellee: Peter K. Michael, Wyoming Attorney General; Robin Sessions Cooley, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General; Wendy S. Ross, Assistant Attorney General. Argument by Ms. Ross.

Representing Guardian ad Litem: Dan S. Wilde, Deputy State Public Defender; Aaron S. Hockman, Chief Trial and Appellate Counsel, Wyoming Guardian ad Litem Program, Office of the State Public Defender. Argument by Mr. Hockman.

Before BURKE, C.J., and HILL, KITE, DAVIS, and FOX, JJ.

DAVIS, Justice.

[¶ 1]    This appeal stems from a child neglect proceeding. The juvenile court found that it was in the child's best interest to cease efforts to reunify him with his mother and to change the permanency plan to termination ·of parental rights and eventually adoption. The mother appealed the juvenile court's order, claiming that the court violated her due process rights when it failed to apply the Wyoming Rules of Evidence during the permanency hearing, and that it did not have sufficient evidence to find that it was in her child's best interests to change the permanency plan to adoption. We address both issues and find that while due process may require an evidentiary hearing when the permanency plan is changed from family reunification to termination of parental rights, mother did not raise the issue below and has not established plain error. As to the second issue, we find that the juvenile court did not abuse its discretion when it changed the permanency plan to adoption. We affirm.

## ISSUES

[¶ 2]    1.    Does due process require that the Wyoming Rules of Evidence apply to review and permanency hearings involving a change in permanency away from family reunification?

2.    Did the juvenile court abuse its discretion when it found that reunification efforts should no longer be pursued in this instance?

## FACTS

[¶ 3]    On May 20, 2013, Casper police officers and a Department of Family Services (DFS) representative responded to a report that a small child (GC) was wandering outside, alone and near a busy street. GC, age two at the time, was only wearing a t-shirt and socks. He was very cold and wet, and was initially unresponsive, but became more alert as he warmed up inside a neighbor's house. After the police officer and DFS child welfare worker arrived, his mother KC (Mother) came out of a house four doors down. .She told them that she had been staying at the residence down the street for the last two weeks, but that she planned to return to Douglas shortly. She indicated that she did not know the names of the people she was staying with, and also said that she could not authorize the officer to · enter the home to check on the conditions in which the child was living. The officer therefore took GC into protective custody because Mother could not demonstrate that he had a safe and appropriate living environment.

[¶ 4]    The State, through the district attorney's office, filed a petition alleging that Mother had neglected GC. The juvenile court held a shelter care hearing on May 22, 2013, and it placed the child in the temporary legal and physical custody of the State. The court appointed a guardian *ad litem* (GAL) for GC, an attorney to represent Mother, and a multi-disciplinary team (MDT) consisting of Mother,[1] a representative of DFS, counselors, the GAL, and various other individuals, including the assistant district attorney who filed the petition. A drug test on samples taken from Mother on May 24, 2013 came

---

1.  GC's father had no involvement with GC, and he did not participate in the proceedings resulting in this appeal. After the State and GAL requested a change in the permanency plan, he contacted DFS and expressed some interest in

getting involved in his son's life. He was evidently reluctant to return to Wyoming from Kansas because of an outstanding arrest warrant here.

back positive for methamphetamine and THC, the active ingredient in marijuana.

[¶ 5]   On June 12, 2013, the court held an initial hearing at which Mother denied the State's allegations of neglect. The court continued GC's placement in the State's custody pending a full hearing on the merits. The MDT held its first meeting in July of 2013, and it recommended family reunification as the permanency goal for GC.

[¶ 6]   An adjudication hearing was scheduled for July 26, 2013, but at the hearing the parties stipulated to a consent decree. Mother admitted the allegations of neglect and agreed to complete a case plan with DFS, and the State agreed that the court should hold the neglect proceedings in abeyance in order to allow Mother time to comply with the plan and demonstrate that she could provide a safe environment for GC. The decree also provided that if Mother failed to comply with the case plan, the State could proceed on the petition and the Court could enter her admissions of neglect on the record. The consent decree was to be in effect until January 2014. If Mother fully complied with its requirements, the neglect petition would be dismissed without an adjudication of neglect.

[¶ 7]   The DFS case plan required Mother to attend visits with GC, demonstrate adequate parenting skills, complete a psychological evaluation, and follow the recommendations of that evaluation. She was also required to complete the testing necessary to evaluate her on the Addiction Severity Index (ASI),[2] and to obtain the treatment required, which included, *inter alia,* substance abuse counseling. She was required to report for random urinalysis testing and to maintain a drug and alcohol free environment, to obtain safe and stable housing and maintain stable employment, and to attend appointments for GC. She was also obligated to provide various information and updates to DFS. The case plan's permanency goal was family reunification.

[¶ 8]   Mother initially complied with the case plan. She had a stable residence, completed an ASI, and complied with the ASI's recommendation for medium intensity group counseling. Visitation with GC also went well. However, in August Mother had two urinalysis tests which were positive for methamphetamine, and her compliance with the case plan and cooperation with DFS began to wane. Nevertheless, the MDT continued to recommend family reunification as the permanency goal after its second meeting in October of 2013.

[¶ 9]   Despite the positive drug tests and Mother's declining compliance with the case plan, she was first allowed unsupervised daytime visits with GC, and then unsupervised overnight visits. However, on November 9, 2013, Mother tested positive for methamphetamine the same day she had GC for an overnight visit. Her counselor indicated that she was in denial about her substance abuse. In addition, on five separate occasions before December, she failed to report for urinalysis testing, and on three other occasions, she reported for testing but failed to provide or dumped her samples. Finally, while a second ASI was not required by the terms of the case plan, she was asked by the State to have the testing done to update the index, but did not.

[¶ 10]   Because of these violations of the case plan, the State moved that the consent decree be set aside and that an adjudication of neglect be entered pursuant to Wyo. Stat. Ann. § 14-3-428(f) in December of 2013. The court held a review hearing and a hearing on the State's motion on January 8, 2014. It orally granted the State's motion for reinstatement of the proceeding and adjudicated GC as neglected by Mother. It did not issue a written order following the hearing until June 6, 2014, evidently due to delay on the part of the State in preparing it. Despite the delay, the order was consistent with the oral ruling. The court also set the case for review in six months, reconfirmed the permanency goal of reunification of GC with his

**2.**   The Addiction Severity Index is a standardized, semi-structured screening and assessment instrument used to establish, among other things, the nature and severity of drug and alcohol prob-

lems. The assessor completing the ASI will recommend a treatment program if the examinee has substance problems.

mother, and continued the physical and legal custody of GC with the State.

[¶ 11] Following the January hearing, the MDT conducted its third and fourth meetings. The third meeting was held in January 2014. At that meeting, despite continuing problems with missed urinalysis tests and denial of substance abuse problems, the MDT again recommended family reunification for GC's permanency plan.

[¶ 12] At the fourth meeting held in April of 2014, the MDT again noted that there were continued problems with urinalysis, including a positive test for methamphetamine in March, and other missed tests and diluted samples. The report described some progress on Mother's mental health issues, but noted that she continued to miss group and individual counseling sessions. Consistent employment was also an issue. Mother stated that she was working inconsistent and sporadic hours at another new job, and that she was working for a temporary service as well. However, she failed to provide pay stubs and indicated that she was being paid "under the table" for at least one job. The majority recommendation after the April meeting was to change GC's permanency plan to termination of parental rights and adoption.

[¶ 13] On May 6, 2014, consistent with the MDT's recommendation, the GAL filed a motion for an order which would allow DFS to cease reunification efforts and change the permanency plan to adoption. Ten days later, the State also filed a motion to waive reunification efforts. Mother objected to the motions and requested that the court require DFS to pay for hair follicle testing because of claimed irregularities with drug testing. She claimed, among other things, that employees at the drug testing center were tampering with her samples.

[¶ 14] On June 4, 2014, the court held another review hearing in conjunction with a hearing on the pending motions relating to the permanency plan. At the hearing, neither the GAL nor the State presented any evidence, but instead based their arguments solely on the MDT reports. Mother did not offer any evidence to refute the findings or factual information in the reports, but her

attorney implied that she would have objected to the foundation of the drug test reports referred to in the MDT reports if the hearing had been a trial, and she argued that hair follicle testing could refute the laboratory reports finding methamphetamine in the samples Mother gave.

[¶ 15] The court orally granted the motions filed by the GAL and the State, changed the permanency plan to termination of parental rights and adoption, and denied Mother's request that the State be required to pay for hair follicle testing. It found that because of Mother's continued use of methamphetamine and a lack of progress on her case plan, it was in GC's best interest to cease efforts at reunification. The court entered a written order consistent with the oral ruling on August 19, 2014. The order changed the permanency plan to adoption. Mother timely appealed from this order.

## STANDARD OF REVIEW

[¶ 16] Regarding the question of whether constitutional due process requires that the Wyoming Rules of Evidence be applied at a hearing in which the State seeks to change a permanency plan from reunification to adoption, our review is de novo. *See Verheydt v. Verheydt*, 2013 WY 25, ¶ 20, 295 P.3d 1245, 1250 (Wyo.2013). The question of whether an individual was afforded due process is a question of law that we also review de novo. *Id.* In *In re MC*, 2013 WY 43, 299 P.3d 75 (Wyo.2013), we explained our standard of review as follows:

> The party claiming an infringement of his right to due process has the burden of demonstrating both that he has a protected interest and that such interest has been affected in an impermissible way. The question is whether there has been a denial of fundamental fairness.

*In re KMO*, 2012 WY 100, ¶ 30, 280 P.3d 1216, 1224 (Wyo.2012) (quoting *In re "H" Children*, 2003 WY 155, ¶ 38, 79 P.3d 997, 1008 (Wyo.2003)). The touchstones of due process are notice and the opportunity to be heard, which must be appropriate to the nature of the case. *"H" Children*, ¶ 39, 79 P.3d at 1008; *see also Frank v. Mangum*,

237 U.S. 309, 347, 35 S.Ct. 582, 595, 59 L.Ed. 969 (1915) ("Whatever disagreement there may be as to the scope of the phrase 'due process of law,' there can be no doubt that it embraces the fundamental conception of a fair trial, with opportunity to be heard.").

*In re MC*, ¶ 29, 299 P.3d at 81.

[¶ 17] We also review challenges to the constitutionality of statutes de novo. *Baessler v. Freier*, 2011 WY 125, ¶ 13, 258 P.3d 720, 725 (Wyo.2011) ("The appellant's burden of proof is heavy, and it includes the obligation to show both that he has a constitutionally protected interest and that it has been infringed in an impermissible way."). Court rules are interpreted and determined to be constitutional or not under the same standard as statutes, and so review of the decisions interpreting them is also de novo. *Kelly v. Kilts*, 2010 WY 151, ¶ 9, 243 P.3d 947, 950 (Wyo.2010); *Busch v. Horton Automatics, Inc.*, 2008 WY 140, ¶ 13, 196 P.3d 787, 790 (Wyo.2008).

[¶ 18] As for the second issue, whether the court erred in finding that the permanency plan should be changed to adoption, the standard of review is abuse of discretion. *In re RE*, 2011 WY 170, ¶ 10, 267 P.3d 1092, 1096 (Wyo.2011). Our review of the sufficiency of evidence to sustain a finding of neglect is governed by the following principles:

1. [We] [g]ive considerable deference to the trial court's determination because it has the advantage to judge the demeanor and intelligence of the witnesses;

2. [We] [e]xamine the evidence in the light most favorable to appellee and resolve all conflicts in evidence for appellee; [and]

3. [We] [a]ssume as true the evidence in appellee's favor, disregard entirely appellant's evidence in conflict with appellee's evidence, and give to appellee's evidence every favorable inference that may fairly be drawn.

*In re MC*, ¶ 30, 299 P.3d at 81 (alterations in original).

## DISCUSSION

## I. Abuse and Neglect Procedures in Wyoming

[¶ 19] A brief review of the process leading to the termination of parental rights is necessary in order to provide context. In Wyoming, the Child Protection Act details the procedures and timelines the State must follow when it steps in to protect a child it alleges has been abused, abandoned, or neglected. Wyo. Stat. Ann. §§ 14–3–401 to 14–3–441 (LexisNexis 2013) (the Act). Wyoming statutes also provide separate procedures to be followed when the State or private individuals seek to terminate parental rights to a child. *Id.*; Wyo. Stat. Ann. §§ 14–2–309 to 14–2–319.

[¶ 20] Typically, abuse and neglect cases arise when a law enforcement officer or DFS takes a child into temporary protective custody because there is reason to believe the child to be abandoned, lost, abused, neglected or in imminent danger to his or her life, health or safety. Wyo. Stat. Ann. § 14–3–405. Within forty-eight hours, a shelter care hearing must be held to determine whether further shelter care is required. Wyo. Stat. Ann. §§ 14–3–409(a), 412. If the district or county attorney's office determines that the best interest of the child requires judicial action, it will file a petition alleging abuse or neglect. Wyo. Stat. Ann. §§ 14–3–408, 409(a), 412. Either at the time of the shelter care hearing or at a separate initial hearing, the judge must advise the parents of their rights and the allegations in the petition, and give them an opportunity to admit or deny them. Wyo. Stat. Ann. §§ 14–3–409(b), 426(a). If the parents deny the allegations, the court will conduct an adjudicatory hearing at a later time. Wyo. Stat. Ann. § 14–3–426(b). The parties have a right to request a jury for the adjudicatory hearing, and they also have the right to present evidence and cross-examine witnesses. Wyo. Stat. Ann. § 14–3–423 to 14–3–426. The State bears the burden of proving that a child has been neglected by a preponderance of the evidence. Wyo. Stat. Ann. § 14–3–425. The Wyoming Rules of Evidence apply with full vigor at adjudicatory hearings. W.R.E. 1101(b)(3).

[¶ 21] If the court (or a jury) finds that the child has been abused or neglected, the court must then hold a disposition hearing. Wyo. Stat. Ann. § 14–3–426(c). It may continue the disposition·hearing for a reasonable· time in order to allow reports to be produced and other evidence bearing on the disposition to be developed. During that time, the court must make a determination as to whether to continue shelter care subject to any terms and conditions it deems necessary. Wyo. Stat. Ann. § 14–3–426(d)–(f). Prior to the disposition hearing, DFS must conduct a study and report to the court regarding the child's history and circumstances with respect to his family, home, and school. Wyo. Stat. Ann. § 14–3–427(a).

[¶ 22] In addition, the court must also appoint a multidisciplinary team that will review the child's personal and family history, school records, mental health records and any other pertinent information and then recommend actions it believes the court should take. Wyo. Stat. Ann. §§ 14–3–427(b)–(e). At the disposition hearing, the court may examine all relevant evidence, and the parties have the right to examine and controvert written reports received as evidence and cross-examine the persons making the reports. Wyo. Stat. Ann. §§ 14–3–426(d).

[¶ 23] As part of its order on the disposition of an abuse/neglect case, the court has the authority to impose requirements and restrictions upon the parents and the child, and it may mandate parenting education, counseling, substance abuse treatment, and other things necessary in the best interest of the child. Wyo. Stat. Ann. § 14–3–429(d). The disposition order remains in effect until it is terminated by the court. Wyo. Stat. Ann. § 14–3–431(a). During the time the disposition order is in effect, the court conducts a review hearing every six months to inquire into the health and safety of the child and the continued need for placement, as well as the adequacy of efforts to reunify the family and the extent of the parent's compliance with the case plan. Wyo. Stat. Ann. § 14–3–431(c). All review hearings are to be conducted without a jury "in an informal but orderly manner." Wyo. Stat. Ann. § 14–3–424(a).

[¶ 24] In addition to review hearings, the court conducts a permanency hearing a minimum of every twelve months if the child continues to be placed outside the home. Wyo. Stat. Ann. § 14–3–431(d). The statutes provide little specific guidance regarding evidence to be considered by the court or the process that is due to the child or the parents at a permanency hearing. However, the statute does require DFS to provide certain information at the permanency hearing:

> [T]he department of family services shall present to the court the efforts made to effectuate the permanency plan for the child, address the options for the child's permanent placement, examine the reasons for excluding other permanency options and set forth the proposed plan to carry out the placement decision, including specific times for achieving the permanency plan. The [DFS] shall provide the court a compelling reason for establishing a permanency plan other than reunification, adoption or legal guardianship.

Wyo. Stat. Ann. § 14–3–431(j).

[¶ 25] At the permanency hearing, the court must determine whether the permanency plan is in the best interests of the child and whether DFS has made reasonable efforts to finalize the plan. Wyo. Stat. Ann. § 14–3–431(k). If the court finds that reasonable efforts to reunite the child with his parent are not required (or are no longer required), and that the child's best interests require something other than family reunification, it will change the permanency plan accordingly. The State must justify the change in the permanency plan by a preponderance of the evidence. *In re RE*, ¶ 12, 267 P.3d at 1096 (citing *In re HP*, 2004 WY 82, ¶ 25, 93 P.3d 982, 989 (Wyo.2004)).

[¶ 26] If the permanency plan is adoption or any other alternative arrangement requiring the parents' rights to be severed, the next step will normally be for the State to file an action for termination of parental rights on the grounds stated in Wyo. Stat. Ann. § 14–2–309(a)(i)–(viii). The termination action is not conducted in the

juvenile court, but is rather a separate action which must be filed in district court.[3]

[¶ 27] The statutes list grounds which justify termination. Wyo. Stat. Ann. § 14-2-309(a)(i)-(viii).[4] At the termination-of-parental-rights (TPR) hearing, a full gamut of procedural rights and processes come into play: the Wyoming Rules of Civil Procedure, including the right to a jury trial, and the Wyoming Rules of Evidence apply. Wyo. Stat. Ann. § 14-2-312 through 14-2-315. At least one ground for termination must be proven by clear and convincing evidence. Wyo. Stat. Ann. § 14-2-309(a).

[¶ 28] Wyoming's statutes thus provide for a full evidentiary hearing or trial at the beginning of the abuse/neglect case when the juvenile court must determine whether there has been abuse or neglect and decides whether to return the child to the custody of his parents or to put the child in the State's custody to protect him from further abuse or neglect. Wyo. Stat. Ann. §§ 14-3-423, 426. They also provide for a full evidentiary hearing or trial in the district court when, at the end of the process, the State seeks to terminate a parent's parental rights. Wyo. Stat. Ann. § 14-2-312.

[¶ 29] Between the bookends of the initial adjudication and the TPR hearing, a number of review and permanency hearings regard-

ing the progress made by the parents toward reunification and the ultimate permanency plan may be held. Those hearings look nothing like the typical evidentiary hearing or trial. In fact, Rule 1101(b)(3) of the Wyoming Rules of Evidence expressly states that the rules of evidence "do not apply in ... juvenile proceedings other than adjudicatory hearings." Moreover, the statutes provide little guidance as to the nature of the process required at these interim hearings.

[¶ 30] Nevertheless, at review and permanency hearings, the juvenile court makes decisions that impact children and their families, in varying ways. For example, the juvenile court may decide to continue foster care, or it may conclude that the requirements of the permanency and DFS plans have been met and return the child to the custody of his or her parents. The juvenile court can also establish what services will or will not be provided to a parent to facilitate reunification, and the court can change aspects of the permanency plan as the parent and child adapt to their new situations. *See* Wyo. Stat. Ann. § 14-3-440. All of these decisions can affect the parents' relationship with the child and ongoing efforts at reunification, and they may also affect the TPR proceeding if the permanency plan is changed to require termination.

---

3. This may be a technical distinction, since district judges also sit as juvenile court judges. Wyo. Stat. Ann. § 5-8-101 (LexisNexis 2013).

4. The statutory grounds for termination are as follows:

(i) The child has been left in the care of another person without provision for the child's support and without communication from the absent parent for a period of at least one (1) year. In making the above determination, the court may disregard occasional contributions, or incidental contacts and communications. For purposes of this paragraph, a court order of custody shall not preclude a finding that a child has been left in the care of another person;

(ii) The child has been abandoned with no means of identification for at least three (3) months and efforts to locate the parent have been unsuccessful;

(iii) The child has been abused or neglected by the parent and reasonable efforts by an authorized agency or mental health professional have been unsuccessful in rehabilitating the

family or the family has refused rehabilitative treatment, and it is shown that the child's health and safety would be seriously jeopardized by remaining with or returning to the parent;

(iv) The parent is incarcerated due to the conviction of a felony and a showing that the parent is unfit to have the custody and control of the child;

(v) The child has been in foster care under the responsibility of the state of Wyoming for fifteen (15) of the most recent twenty-two (22) months, and a showing that the parent is unfit to have custody and control of the child;

(vi) The child is abandoned at less than one (1) year of age and has been abandoned for at least six (6) months;

(vii) The child was relinquished to a safe haven provider in accordance with W.S. 14-11-101 through 14-11-109, and neither parent has affirmatively sought the return of the child within three (3) months from the date of relinquishment;

(viii) The parent is convicted of murder or homicide of the other parent of the child under W.S. 6-2-101 through 6-2-104.

[¶ 31] In the case of a change in the permanency plan to an alternative that requires termination of parental rights, the effect of the passage of time on the later TPR proceeding is often significant. As one commentator has pointed out, "[t]he time that passes between a permanency plan change away from reunification and any later permanency trial heightens [the] state power and increases the likelihood that a termination of parental rights, adoption, or guardianship motion will both be filed and granted, thereby permanently eliminating parents' rights to care, custody and control of their children." Josh Gupta–Kagan, *Filling the Due Process Donut Hole: Abuse and Neglect Cases between Disposition and Permanency*, 10 Conn. Pub. Int. L.J. 13, 38 (2010). By the time the TPR hearing takes place, the child may have been living in foster care (sometimes with potential adoptive parents) for years, and the court will inevitably consider how well he or she is doing there and the bonds formed between the child and his foster family as a factor in determining whether to terminate parental rights. *Id.* In addition, the juvenile court will examine the child's relationship with his parent, which will necessarily have been affected by the passage of time and separation from them. *Id.* at 38–39. The State controls the timing of filing the proceeding.

## II. Due Process Rights in Permanency and Review Hearings

[¶ 32] Few courts have recognized the effect of a change in permanency to termination in any meaningful way. Yet the question of whether parents have a due process right to participate meaningfully in permanency hearings occurring long before hearings on termination of parental rights is a significant one. The Wyoming Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law." Wyo. Const. art. 1, § 6. The touchstone of our due process guarantee is the belief that parties are entitled to notice and an opportunity to be heard when their rights are at stake. *In re "H" Children*, 2003 WY 155, ¶ 38, 79 P.3d 997, 1008 (Wyo. 2003). However, the process due at any given time must reflect the nature of the

proceeding and the interests involved. *Id.*, ¶ 39, 79 P.3d at 1008.

[¶ 33] We have held that a parent's substantial rights are affected when the permanency plan is changed from reunification to termination and adoption. *In re HP*, 2004 WY 82, 93 P.3d 982 (Wyo.2004). In *In re HP*, we considered whether a juvenile court order stemming from a review hearing changing the permanency plan from reunification to termination and adoption was an appealable order. We held that because an order at a permanency hearing halting reunification efforts affects substantial rights, it is appealable:

> [U]nder W.R.A.P. 1.05(b), an order affecting a substantial right made in a special proceeding is an appealable order. Proceedings in juvenile court are special proceedings and both adjudication and disposition affect substantial rights. As discussed above, the court adjudicated neglect following the initial hearing. This order did however follow a dispositional review hearing and appears to be a dispositional order because it orders DFS to begin termination proceedings. **In any event, the order certainly affects Mother's substantial rights as it has the effect of halting reunification attempts.** Therefore, we treat it as an appealable order.

*In re HP*, ¶ 23, 93 P.3d at 989 (emphasis added) (citations and quotation marks omitted).

[¶ 34] Not all review hearings have the same impact. At one end of the spectrum, a review hearing at which an ongoing permanency plan is reviewed and continued pending some required action by the parents will have relatively minor impact on the parties. At the other end of the spectrum, a permanency hearing in which a court changes the permanency plan from reunification to termination of parental rights has significant impacts, not only on parents, but on children as well.

[¶ 35] Of course, one core constitutional interest at stake in all abuse and neglect cases is the parents' interest "in the care, custody, and control of their children."

*Troxel v. Granville,* 530 U.S. 57, 65, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000) (citing *Meyer v. Nebraska,* 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (recognizing that the liberty protected by the due process clause includes the right to bring up children); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925) (recognizing that the liberty of parents includes the upbringing and education of their children); *Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (confirming the constitutional nature of parental rights to direct the upbringing of their children)). "Permanency hearings not only threaten substantial prejudice to parental rights, they bear a direct relation to the TPR hearing. The motion to terminate is based largely on conduct between the petition and the permanency hearing." *State of New Mexico v. Maria C.,* 136 N.M. 53, 94 P.3d 796, 806 (App.2004).

[¶ 36] There is also the reciprocal interest of the child in maintaining his relationship with his parents. *Santosky v. Kramer,* 455 U.S. 745, 760, 102 S.Ct. 1388, 1398, 71 L.Ed.2d 599 (1982) ("the child and his parents share a vital interest in preventing erroneous termination of their natural relationship"). Finally, the State has an interest in providing for the best interest of the child, which includes resolution in a speedy fashion to avoid what has become known as "foster care limbo." *See In re AGS,* 2014 WY 143, ¶ 17, 337 P.3d 470, 476–77 (Wyo.2014).

[¶ 37] Because "termination proceedings are largely based on the parent's conduct from the time the child is taken into custody until the court decides further assistance to the parent is futile . . ., [i]f parents are not afforded an early opportunity to defend against charges of abuse and neglect before the end state, termination may very well be a foregone conclusion." *Maria C.,* 94 P.3d at 807. As we have pointed out, at TPR proceedings, the parties have extensive procedural due process guarantees, including rights to a jury trial, to present evidence and to cross-examine witnesses, and the State has a high burden to prove grounds for termination by clear and convincing evidence. Wyo. Stat. Ann. §§ 14–2–309, 312; § 14–3–

423; *see In re RE,* ¶ 22, 267 P.3d at 1100; *In re HP,* ¶ 32, 93 P.3d at 991.

[¶ 38] However, we must also be mindful that proceedings after adjudication and prior to the TPR hearing substantially impact the rights of the parties, as discussed above. "Even though parental rights are not irrevocably decided at a permanency hearing, the general purpose of these hearings 'is to compel a resolution of the case so the child does not remain indefinitely in the system.'" *Maria C.,* 94 P.3d at 806 (citations omitted). It is usually a foregone conclusion that once a permanency plan is changed from family reunification to adoption or other permanent placement outside the home, an action to terminate parental rights will eventually be filed. Moreover, at the permanency hearing, the State will often rely on facts justifying termination, even though a formal TPR hearing follows. *Id.,* 94 P.3d at 806. We therefore conclude that parents have a due process right to meaningful participation at permanency hearings when the State seeks to change permanency from family reunification to another status that will require termination of parental rights.

[¶ 39] The process due at such hearings must be evaluated in light of the process received throughout the proceedings and must be proportionate to the issues at stake. *In re "H" Children,* ¶ 39, 79 P.3d at 1008 (stating that "[n]ot all infringements [affecting fundamental rights] are of the same magnitude" and explaining that the termination of parental rights requires clear and convincing evidence while neglect must only be shown by the preponderance of the evidence). Indeed, as the United States Supreme Court recounted, "'(d)ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. . . . [It] is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge,* 424 U.S. 319, 334, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (citing *Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961); *Morrissey v.*

*Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)).

[¶ 40] In *Maria C.,* the New Mexico Court of Appeals was faced with the question of what type of procedure ought to be provided in a permanency hearing involving a change that would result in termination of parental rights. That court concluded that "notice and the opportunity to participate in a permanency hearing would contribute to the overall fairness of the procedure by giving parents an opportunity to present their side of the story, prepare a defense if termination is in the offing, or avoid the TPR hearing altogether by having the case dismissed." *Maria C.,* 94 P.3d at 807. The New Mexico court recognized that "[e]ffective counsel might also expose weaknesses in the State's case and cross examination could be useful as an impeachment tool. Testimony from the parents regarding their efforts to rehabilitate might influence the court's decision" as well. *Id.*

[¶ 41] We generally agree with the New Mexico approach. Permanency hearings, when there may be a change in the plan from reunification to termination of parental rights, implicate substantial rights and thus require meaningful due process.

[¶ 42] We take this opportunity to define the process due at such a hearing. Due process requires that if a change in permanency plan includes adoption or permanent placement other than reunification, the parents must have the right to request, and on request must be provided with, an evidentiary hearing. The parent must request the hearing if he or she desires one, because there may be instances in which parents do not dispute a recommendation or are content with a non-evidentiary hearing. The failure to request such a hearing waives that right.

[¶ 43] As we have already noted, Wyoming Rule of Evidence 1101 specifically states that the Rules of Evidence do not apply to "juvenile proceedings other than adjudicatory hearings." W.R.E. 1101(b)(3). Wyoming's Rules of Evidence do not apply in probation revocation proceedings in criminal cases. *Id.* However, probationers are entitled "to appear in person and by counsel, to confront and examine adverse witnesses, and at the dispositional stage to make a statement in mitigation of revocation." W.R.Cr.P. 39(a)(5)(A).

[¶ 44] A similar process is sufficient to protect the rights of the parents in change-of-permanency hearings. The parent requesting a hearing is entitled to put the State to its proof, to be present, to confront and cross-examine witnesses, to call witnesses, and to present a case in support of a continued plan of reunification or dismissal of the case. Hearsay evidence that is probative, trustworthy and credible may be received at the hearing. Finally, we reiterate that at the permanency hearing the State has the burden of establishing by a preponderance of the evidence that a change in the permanency plan is in the best interests of the child. Although these procedures are not as protective of parental rights as those which must be employed in a later TPR hearing, they provide realistic and meaningful protection against an erroneous decision at a critical point in the process. They are also consistent with W.R.E. 1101, as evidentiary rules need not be applied with full vigor at this stage of the juvenile court proceeding. We therefore conclude that Rule 1101 is not unconstitutional as argued by Appellant.

[¶ 45] We will apply this ruling prospectively; that is, only to permanency hearings when there may be a change in the plan from reunification to termination of parental rights that occur after this Opinion is published. *C.f. Adkins v. Sky Blue, Inc.,* 701 P.2d 549, 553–54 (Wyo.1985).

### III. Due Process in this Case

[¶ 46] While this Court's aforementioned ruling will be applied prospectively, we must still determine whether Mother's rights to due process were violated. She contends that it was error for the juvenile court to apply W.R.E. 1101(b)(3) and rely solely on the MDT reports, which contained hearsay evidence, in spite of what she characterizes as an objection to that procedure and a request for follicle testing. In essence, Mother claims that the procedure was flawed

because it did not allow her to meaningfully challenge the evidence contained in the MDT reports, and that her right to due process was violated as a result.

[¶ 47] The State takes the position that Mother cannot now argue that the juvenile court's failure to apply the Wyoming Rules of Evidence at the review hearing violated her constitutional rights because she did not raise the issue below. Rule 9.05 of the Wyoming Rules of Appellate Procedure provides an exception to the general rule that an issue must be raised in the lower court before it can be argued on appeal: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." W.R.A.P. 9.05. This rule contemplates appellate review when "1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice." *In re AGS*, ¶ 34, 337 P.3d at 480 (citing *Deeds v. State*, 2014 WY 124, ¶ 21, 335 P.3d 473, 479 (Wyo.2014)). "The appellant bears the burden of proving plain error." *Id.* The State argues that Mother cannot meet the plain error standard.

[¶ 48] Mother did not request an evidentiary hearing, which we have now held above is required to obtain one. She likewise did not directly claim that the hearing held violated her right to due process. However, her attorney did at least imply that if she had the opportunity to challenge the foundation of the laboratory reports indicating that Mother had tested positive for methamphetamine, she would do so. Her attorney's entire argument concerning the evidentiary issue consists of the following: "certainly we're not in a trial here for me to object as to foundation as to the laboratory reports, but to the presumptive positives for methamphetamine, Your Honor. And that's why my client was willing to step up and say she believes there's an irregularity and she would request that hair follicle tests be done." *See Anderson v. State*, 2014 WY 13, ¶ 20, 317 P.3d 1108, 1115 (Wyo.2014).[5]

[¶ 49] We doubt that the comment made by Mother's counsel was sufficient to constitute a claim that she was being denied due process, and we are certain it could not be considered a demand for a full evidentiary hearing. However, we cannot fault Mother or her attorney for not taking actions we here hold to be necessary for the first time. We will therefore determine whether it was plain error to fail to provide an evidentiary hearing like that described above under the circumstances. The dispositive issue is whether there was a transgression of a clear and unequivocal rule of law.

[¶ 50] W.R.E. 1101(b)(3) states that the rules of evidence do not apply in "juvenile proceedings other than adjudicatory hearings." The juvenile court followed that rule. We hold in this case that an evidentiary hearing utilizing procedures like those employed in probation revocation proceedings satisfies due process in these circumstances. That was not the rule when the juvenile court made its decision, and it was therefore not clear or unequivocal at the time. Accordingly, there was no plain error in conducting the permanency hearing as the court did. It is also worth noting that Mother has not argued that she meets the plain error standards in her brief; rather, she just contends that Rule 1101(b)(3) is unconstitutional and does not address the plain error standard.

## IV. Sufficiency of Evidence

[¶ 51] Finally, Mother challenges the sufficiency of the evidence to support the juvenile court's finding that a change in the permanency plan was warranted, and that the recommended permanency plan of adoption would be in GC's best interests. We must determine whether the juvenile court abused

---

5. The juvenile court offered Mother's counsel an opportunity to object to the reports, and she indicated that she had no objection. Mother relied on portions of the reports to support her claim that she was complying with the plan. In her brief, Mother argues that MDT reports were flawed for technical reasons. We decline to address this contention because it was not raised below, and Mother did not object to the juvenile court receiving them and relied upon portions of them herself. *In re AGS*, ¶ 33, 337 P.3d at 480; W.R.A.P. 1.04.

its discretion. *In re RE,* ¶ 10, 267 P.3d at 1096.

[¶ 52] Mother argues that she complied with her case plan because she had adequate housing and a job, and because visitation with GC was going well. She takes the position that the court relied solely upon the MDT reports showing that she failed to report for drug testing and that some tests were positive for methamphetamine to change the permanency plan. She claims that because the positive results in the reports were hearsay and because there were irregularities with the testing, the State failed to meet its burden and the court abused its discretion by finding that reunification efforts should cease.

[¶ 53] At the hearing, the court explained its reasoning:

[In July of 2013] I communicated that the mother needed to make a pretty tough decision and pretty substantial commitment to her child rather than methamphetamine. And unfortunately, I do not believe she has complied with taking care of that problem. . . .

. . . We have multiple violations of [the] Family Service Plan because of the UAs on the several and numerous dates over the extended almost year period of time that's involved here.

In addition, a very strong component of the Family Service Plan is to make sure there's ongoing drug testing. And . . . the record documents an ongoing failure to appear to Day Reporting, and so we don't even know what some of those test results may be. Additionally, I didn't put much weight on the housing concern; but it does appear there's been ongoing instability with employment, with counseling, with other components of the Family Service Plan. . . . [T]here needs to be substantial progress made towards any reunification effort; and I do not see that in this case.

[¶ 54] In the case of *In re ARC,* 2011 WY 119, 258 P.3d 704 (Wyo.2011), we considered whether termination of parental rights was justified under similar circumstances. There the mother "only occasionally showed up for UAs, many of which were positive for illegal drug use." *Id.,* ¶ 27, 258 P.3d at 710. At her TPR hearing, however, the mother testified that she had become sober. *Id.* We affirmed the termination of her parental rights based upon missed and failed drug tests and her ultimate failure to address her substance abuse problems. *Id.,* ¶ 32, 258 P.3d at 711.

[¶ 55] We have already noted that in a TPR case, grounds for termination must be established by clear and convincing evidence, a higher burden of proof than imposed in most civil matters. Wyo. Stat. Ann. § 14–2–309(a). In contrast, when a change in the permanency plan is sought, the burden upon the State is to prove grounds for that change by a preponderance of the evidence.

[¶ 56] We find that the court did not abuse its discretion in ordering a change in the permanency plan for GC. The court's finding that Mother failed to comply with her case plan is well-supported by the record, and was proven by a preponderance of the evidence presented. Of major significance were her repeated failures to appear for required drug testing. While Mother alleged there were "irregularities" with the drug testing, she has not even attempted to explain her repeated failure to appear for tests. Moreover, Mother failed a number of tests, indicating that she had an ongoing substance abuse problem. Finally, there were also other ongoing problems with maintaining steady employment and cooperating with the counseling required by the plan.

### CONCLUSION

[¶ 57] We find that while due process requires an evidentiary hearing as described above when the permanency plan is changed from reunification to any alternative requiring termination of parental rights, Mother did not directly raise the issue below and has not established plain error in the manner in which the hearing was held. In addition, we find that the juvenile court acted within its discretion in changing the permanency plan as it did. We therefore affirm.