# IN THE SUPREME COURT, STATE OF WYOMING

## 2017 WY 36

### APRIL TERM, A.D. 2017

### April 5, 2017

IN THE INTEREST OF: DT and NT,
Minor Children.

ST,

Appellant
(Respondent),

v.

THE STATE OF WYOMING,

Appellee
(Petitioner).

S-16-0184

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellant:*
> Christopher G. Humphrey of Christopher G. Humphrey, P.C., Cheyenne, Wyoming.

*Representing Appellee:*
> Peter K. Michael, Wyoming Attorney General; Misha E. Westby, Deputy Attorney General; Jill E. Kucera, Senior Assistant Attorney General; Christina F. McCabe, Senior Assistant Attorney General. Argument by Ms. McCabe.

*Representing Guardian Ad Litem:*
> Dan S. Wilde, Deputy State Public Defender, Aaron S. Hockman, Chief Trial and Appellate Counsel, Wyoming *Guardian Ad Litem* Program.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FOX, Justice.**

[¶1]   ST (Mother) appeals from the juvenile court's order changing the permanency plan from reunification to adoption. Mother claims that the juvenile court erred when it did not make a determination prior to the hearing regarding the children's attendance at the permanency hearing, and that she was denied due process of law when the permanency hearing was held without the children. Mother also contends that there was insufficient evidence presented by the State of Wyoming, Department of Family Services (DFS), to support the juvenile court's decision to change the permanency plan from reunification to adoption. We affirm.

## ISSUES

[¶2]   1.   Did the juvenile court commit plain error when it did not determine whether the children should be present at the hearing prior to the hearing?

2.   Were Mother's due process rights violated when the juvenile court did not require the presence of the children at the hearing?

3.   Was there sufficient evidence to support the juvenile court's change in the permanency plan from reunification to adoption?

## FACTS

[¶3]   A Cheyenne police officer responded to a DFS referral to conduct a welfare check on two children, DT and NT, at the Big Horn Motel in Cheyenne, Wyoming. Upon arrival, the officer observed that the motel room was "filled with various boxes, clothing, furniture, and other belongings to a height of around 6 feet." When the officer knocked, NT climbed over the items in the room to answer the door. Mother and TO (Mother's boyfriend) were asleep inside the room. The officer could only partially open the door and was unable to enter the room. He observed that the children were wearing dirty clothing and had visible dirt on their skin. The children told the officer that they had not bathed in a week because they could not get past the piled possessions to the shower. The officer also observed an open bottle of vodka, marijuana, and drug paraphernalia inside the room. Based on these observations, the officer determined that the children's safety was at risk and placed DT and NT into protective custody.

[¶4]   The State filed a petition alleging that Mother had neglected DT and NT. The juvenile court held a shelter care hearing on August 18, 2014, and in a Stipulated Order for Continued Shelter Care, it placed the children in the temporary legal custody of the State, with temporary physical placement with Mother. The court appointed a *guardian ad litem* (GAL) for DT and NT, and an attorney to represent Mother.

1

[¶5]    On October 9, 2014, the juvenile court held an initial hearing at which the parties stipulated to a Consent Decree.  Mother admitted to the allegations of the neglect petition, agreed to complete the DFS case plan, and agreed to undergo random drug testing at the direction of DFS. The State requested that the court hold the neglect proceedings in abeyance.  The DFS case plan, with the goal of family preservation, required Mother to obtain permanent housing and maintain a clean home, complete parenting classes, complete the testing necessary to evaluate her on the Addiction Severity Index (ASI)[1] and follow any recommendations of the evaluation, and maintain employment.  The Consent Decree also provided that if Mother failed to fulfill any of the terms and conditions of the decree, the State could proceed on the petition and Mother would be considered in contempt of court.  The Consent Decree was to be in effect for six months, unless sooner discharged by the court, and could be extended for an additional six months upon good cause.  The court ordered that prior to completion of the initial six-month period, the parties would conduct a Multidisciplinary Team (MDT) meeting to determine whether the decree should be dismissed or extended.  The children continued to be in the legal custody of the State, with physical placement with Mother.

[¶6]    Mother struggled to comply with the case plan.  DFS did a random drop-in at the end of October 2014, and found the motel room again filled with various boxes, belongings, and furniture.  Mother told DFS everything would be out of the room by the following day, and when DFS returned, the room had been cleaned, and DFS allowed the children to stay in Mother's physical custody.  Mother completed the required parenting classes.  Mother participated in an ASI evaluation through Pathfinder, a drug addiction treatment center, which recommended Mother participate in an Intensive Outpatient Treatment (IOP) program.

[¶7]    DFS requested that Mother submit to weekly urine analysis (UA) tests, and Mother agreed to do them at Drug Testing Center of Cheyenne.  Mother arrived for her first scheduled UA on November 5, 2014, and was unable to provide an adequate sample amount.  The following day Mother was able to provide an adequate, negative sample.  Mother then requested that she be able to complete future UA tests at Pathfinder so she could participate in the IOP program at the same place; DFS agreed.  Mother provided a second negative UA on November 13, 2014.  Mother failed to provide any further urine analysis at either the Drug Testing Center or Pathfinder, notwithstanding DFS's repeated requests that she do so.  Mother also failed to participate in any IOP program as recommended by Pathfinder and required by the case plan.

---

[1] "The Addiction Severity Index is a standardized, semi-structured screening and assessment instrument used to establish, among other things, the nature and severity of drug and alcohol problems. The assessor completing the ASI will recommend a treatment program if the examinee has substance problems." *KC v. State*, 2015 WY 73, ¶ 7 n.2, 351 P.3d 236, 240 n.2 (Wyo. 2015).

[¶8]   In its December 2014 Quarterly Progress Report, DFS recommended that the Consent Decree be revoked based on Mother's failure to cooperate with her case plan and court orders.  These failures consisted of multiple unsuccessful attempts by DFS to check conditions of the motel room, including both unannounced drop-ins and attempts to schedule appointments to check the conditions, failure to complete UA tests, and failure to participate in an IOP program.  On December 22, 2014, DFS attempted another unannounced drop-in at the motel.  After Mother failed to answer the door, DFS asked the motel manager to open the door.  Upon entry, DFS found the room in the same cluttered condition as it had been in August.  The children were hiding under a table and Mother was hiding in the bathroom.  DFS determined that the children's safety was again at risk and placed DT and NT back into protective custody.

[¶9]   The State then filed a Petition to Revoke Consent Decree.  By this time, Mother had missed six scheduled UAs, failed to begin an IOP program, and failed to provide a safe, clean environment for the children.  At the hearing, Mother admitted to the allegations supporting the petition to revoke the Consent Decree.  Also at the hearing, Mother told DFS that she could not afford the UA testing, and DFS informed Mother that DFS would pay for the testing through the Drug Testing Center.  The juvenile court entered Mother's prior admission to the allegations in the original neglect petition, and found DT and NT to be neglected children.  The court ordered that DFS would have legal and physical custody of DT and NT.

[¶10]  DFS completed a Six Month Review report in early February 2015.  Mother had been kicked out of the motel, she no longer had a working phone number, and DFS had been unsuccessfully trying to reach Mother via e-mail.  DFS noted in the report that the permanency plan was still family reunification despite the fact that Mother still had not started an IOP program or submitted to any UA testing since November 13, 2014.

[¶11]  The initial MDT meeting was held on February 17, 2015.  Mother did not attend, but her attorney was present.  DFS recommended that the children remain in the legal custody of DFS, with physical placement in foster care.  The State further recommended that Mother work her case plan.  In its Predisposition Report filed with the court on March 6, 2015, DFS stated that Mother had still not participated in an IOP program, or complied with her court ordered UAs, but recommended that the permanency plan still be family reunification.

[¶12]  At a disposition hearing on April 9, 2015, the juvenile court found it in the best interest of the children to remain in the legal custody of the State, with physical placement in foster care.  The court ordered Mother to work her case plan and undergo the previously ordered random UA tests. Mother requested to change the location of the UA testing to Foundations.  The court also ordered DFS to begin an Interstate Compact on the Placement of Children (ICPC), Wyo. Stat. Ann. § 14-5-101 (LexisNexis 2015), home study on the maternal grandparents in South Dakota.

3

[¶13] DFS filed another Quarterly Progress Report with the court in May 2015. At that time the permanency plan was still family reunification. DFS reported that it had informed Mother that it could not pay for UA testing through Foundations due to pricing, but that it would still pay for the testing through the Drug Testing Center. DFS contacted the Cheyenne Housing Authority and provided Mother with an application to complete and return to the Housing Authority, and referred Mother to several job openings. As of the date of the report, Mother had still not participated in an IOP program or completed any UA testing. Mother was unemployed and did not have a stable residence. DFS had been in contact with the maternal grandmother (Grandmother) in South Dakota, and had started the ICPC process.

[¶14] The second MDT meeting was conducted on May 21, 2015. Grandmother attended by phone and the MDT Meeting Report noted that Grandmother had begun the ICPC process, and was looking forward to having the children live with her. Mother stated that she wanted the children to go to Grandmother, and she explained that she could not afford an IOP program, she had not completed further drug testing, and she did not have a job or a place to live. The MDT again recommended that the children stay in the legal and physical custody of the State, that Mother continue to work her case plan, and that she complete the required UA testing.

[¶15] Mother did not attend the third MDT meeting held on August 11, 2015. DFS noted again that Mother had not been working her case plan and had not completed any UA testing, and indicated that without significant progress in her case plan, it would recommend a change to the permanency plan.

[¶16] DFS submitted a 12 Month Permanency Hearing report, which indicated that Mother would be required to complete a new ASI evaluation, as the initial one was no longer up to date. Additionally, the report informed the court that Mother still did not have a stable residence, had not participated in the required UA testing, and had not kept in contact with the DFS caseworker on her case. DFS still recommended family reunification, but noted that the ICPC was completed and placement with Grandmother had been approved. At the twelve-month permanency hearing held on September 3, 2015, the court ordered that the legal custody of the children would remain with the State, with placement in relative foster care. The children had been residing with Grandmother in South Dakota since August 20, 2015.

[¶17] In its November 2015, Quarterly Progress Report, DFS recommended that the permanency plan change from family reunification to adoption or guardianship with the maternal grandmother. At the fourth MDT meeting in December 2015, Grandmother attended by phone and, according to the MDT Report prepared by the MDT Facilitator, Grandmother informed the group that

4

the children were doing "awesome;" they wanted the case to be "over and done with" so they knew they had a safe home. [Grandmother] added the children asked "all the time" if [Grandmother and Grandfather] would adopt them. [Grandmother] shared when the children had phone contact with [Mother] it would not end well. [Mother] would say rude comments that would upset them. This would make it so the children would not want to talk to her. [Grandmother] mentioned the Interstate Compact Placement of Children (ICPC) caseworker came and spoke with the children; in which they told her they wanted to see [Mother] but they wanted to stay with [Grandmother and Grandfather]. [Grandmother] stated the children missed [Mother] but they were ready to get "on with their lives." [Grandmother] added [Mother] had not proved she was getting things together.

Mother did not attend the meeting. Mother had yet to complete a new ASI evaluation, resume UA testing, or work her case plan. The MDT recommended legal custody remain with the State, physical placement remain with Grandmother, and the permanency plan be changed from family reunification to adoption with the grandparents.

[¶18] The juvenile court held a permanency hearing on April 14, 2016. The children were not present. The DFS caseworker assigned to the case and Mother were called as witnesses. The DFS caseworker testified as to what had been reported over the last eighteen months through progress reports and MDT meeting reports: Mother had not complied with the case plan, had not sought treatment through an IOP program, and had not completed the required UA testing as ordered by the court. The DFS caseworker also testified about the children's preferences:

> Q. [State:] Okay. So generally, can you summarize how they're doing there [with Grandmother in South Dakota]?
>
> A. [DFS caseworker:] They're doing very well there. They're very happy. They appear very adjusted. They said they don't want to leave, that they like it there.
>
> . . . .
>
> Q. Okay. Have you discussed your recommendations with the children?
>
> A. Yes.

5

Q.   And what's their position?

A.   They want to be adopted.

The GAL also questioned the DFS caseworker about the preference of the children:

Q. [GAL:] Okay.   And I believe you stated this already, but the children have indicated it is their preference to be adopted by their grandmother; is that correct?

A. [DFS caseworker:] Yes.

[¶19]  Mother testified that she was unable to participate in an IOP program or complete UA testing because she could not afford it, and that DFS had never informed her that they would pay for the testing through Pathfinder.   Later, she testified "I have asked DFS several times if they would pay for the IOP, and I always got told no," but that she was told DFS would pay for the UA testing.   Mother also testified that the day before the hearing, she attempted to complete an updated ASI evaluation at Pathfinder, but was unable to do so because the first ASI evaluation had not been paid for.   She then stated that Pathfinder called her the morning of the hearing and let her know that the first ASI evaluation had in fact been paid.   Mother testified that she continually tried to contact the DFS caseworker assigned to her case by stopping by the DFS office, or calling the DFS office, but the "people at the front desk" would "tell me she's either busy or she's not here, and they'd tell me, I don't know what to tell you.   Come back," and that she was unable to leave messages or make appointments to meet with the DFS caseworker.

[¶20]  The juvenile court made the following comments with respect to Mother's credibility:

[Court:] I heard [Mother] say things, some of which are fantastic, and I -- again, it's difficult to say this to somebody, but I'm believing [the DFS caseworker] and not you.   You weren't at the front desk of DFS being told no appointment, she's not here, and lying to you about her presence.   I don't believe that happened, ma'am, and that taints -- not all, but it taints quite a bit of what you said to me today.

. . . .

Your own testimony is inconsistent, because you said you got e-mails from them, and then you never sent e-mails back out for a certain number of months.   You went there, and you tried to talk.   You didn't e-mail back.   That's ridiculous.

6

. . . .

> There is no inconsistency between what [the DFS caseworker] says about paying for and going through IOP and what she said. There is no inconsistency. They both say the same thing. All this mother had to do was follow up, show up at the DFS office, work a little harder making that connection, produce this fact of difficulty getting it paid for and all that, and then DFS works it out.

The court considered Mother's effort to obtain an ASI evaluation the day prior to the hearing to be a desperate move to convince the court that she was willing to comply with the case plan.

[¶21] Prior to closing arguments, the juvenile court noted the statutory requirement to determine whether the children should be present at the hearing, and it obtained the GAL's recommendation that they did not need to be present and that she was prepared to express their preference. The GAL also expressed the children's wishes in her closing argument:

> They absolutely have a loving home. They're very happy there. It is their wish that this Court understand at their ages, while they're still quite young, that eight, almost nine, that they wish very much to be adopted; that they wish to remain in the home where they are.

[¶22] At the conclusion of the hearing, the juvenile court found it to be in the best interest of the children to change the permanency plan from family reunification to adoption. The court issued its written order, finding by clear and convincing evidence that reunification efforts had been unsuccessful, and it was in the best interest of the children for the permanency plan to be changed from family reunification to adoption. The court also found that it was inappropriate for DT and NT to attend the permanency hearing, and their preferences had been expressed through the DFS caseworker and the GAL. The court ordered that the legal custody of DT and NT would remain with the State, the physical custody would remain with Grandmother, and DFS could cease reunification efforts and would be required to proceed with a plan that focused on adoption. Mother timely appealed from the permanency order.

### STANDARD OF REVIEW

[¶23] To determine the juvenile court's obligations regarding the children's presence at the permanency hearing, pursuant to Wyo. Stat. Ann. § 14-3-431(k)(iii), (iv) (LexisNexis

7

2016 Supp.), we engage in statutory interpretation, a question of law that we review de novo. *In re CRA*, 2016 WY 24, ¶ 15, 368 P.3d 294, 298 (Wyo. 2016). "The question of whether an individual was afforded due process is a question of law that we also review de novo." *KC v. State*, 2015 WY 73, ¶ 16, 351 P.3d 236, 241 (Wyo. 2015). However, Mother made no attempt to have the children present, nor did she object to their absence at any time during the permanency hearing. Thus our review is limited to a search for plain error. "We have often repeated that we will not consider a new issue on appeal that has not first been brought to the attention of the district court." *In re AGS*, 2014 WY 143, ¶ 33, 337 P.3d 470, 480 (Wyo. 2014) (citations omitted). "There are two exceptions to this rule: when the issue raises jurisdictional questions or when the issue is of such a fundamental nature that it must be considered." *In re Termination of Parental Rights to IH*, 2001 WY 100, ¶ 25, 33 P.3d 172, 182 (Wyo. 2001). Termination of parental rights "affect the fundamental liberty of familial association," *In re AGS*, 2014 WY 143, ¶ 33, 337 P.3d at 480, and therefore we consider those issues on appeal for which Mother has provided argument and authority.

> W.R.A.P. 9.05 requires that we review such issues for plain error. Plain error occurs when "1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice." *Deeds v. State*, 2014 WY 124, ¶ 21, 335 P.3d 473, 479 (Wyo. 2014) (citations omitted). "The appellant bears the burden of proving plain error[.]" *Id.*

*In re AGS*, 2014 WY 143, ¶ 34, 337 P.3d at 480.

## *DISCUSSION*

### I.   *Did the juvenile court commit plain error when it did not determine whether the children should be present at the hearing prior to the hearing?*

[¶24]   At a permanency hearing, the juvenile court shall:

> (iii) Ask the child about his desired permanency outcome if it is determined that the child should be present at the hearing;
> (iv) Ask the child's guardian ad litem or other legal representative about the child's desired permanency outcome if it is determined inappropriate for the child to be present at the hearing;

8

Wyo. Stat. Ann. § 14-3-431(k)(iii), (iv). DT and NT were not present at the permanency hearing, and the juvenile court did not determine that they need not be present until the end of the hearing. Mother argues that the juvenile court erred when it failed to make a prehearing determination whether the children should be present at the permanency hearing.

[¶25] "When interpreting a statute and its application, we first look at the plain language used by the legislature. If the statute is sufficiently clear and unambiguous, the Court simply applies the words according to their ordinary and obvious meaning." *In re CRA*, 2016 WY 24, ¶ 16, 368 P.3d at 298 (internal citations omitted). Mother argues that the use of "if it is determined" in Wyo. Stat. Ann. § 14-3-431(k)(iii), (iv), is in the past tense and "indicate[s] that the determination is to be made prior to the hearing." The State agrees that the phrase is in the past tense, but argues that a determination at the hearing, rather than before, is still consistent with the statutory language. The GAL contends that Wyo. Stat. Ann. § 14-3-431(k)(iii) and (iv)

> do not mandate a pre-hearing determination whether the child should be present, but only that the court make a determination that it was inappropriate for the children to be present at the hearing based upon the reasons set forth by the child's guardian *ad litem* or counsel, if the children are absent.

[¶26] The statute clearly requires the juvenile court to make the determination whether the children should be present. In addition, Rule 2(a) of the Rules of Procedure for Juvenile Courts states: "A child who is not of suitable age to understand or participate in the proceedings need not be present at hearings in abuse and neglect actions unless the court so orders." The rule establishes a presumption that children will be present, unless they are not of suitable age to understand or participate, and necessarily requires a determination by the court if the child is not present. To have a meaningful effect, the determination of whether the children should be present at the hearing should be made prior to the hearing. However, under our plain error standard of review, we cannot find that there was a transgression of a clear and unequivocal rule of law. The statute does not expressly require the decision to be made prior to the hearing.[2] Further, we find no denial of a substantial right resulting in material prejudice. The juvenile court did make the required determination, albeit at the end of the hearing. Mother does not dispute that the testimony of the DFS caseworker and the GAL adequately conveyed the children's desired permanency outcome. We find no plain error.

---

[2] "If it is determined" is not, despite the parties' agreement, the past tense. Rather, it is a conditional verb. https://www.grammarly.com/blog/conditional-verbs/ (last visited March 31, 2017).

## II. Were Mother's due process rights violated when the juvenile court did not require the presence of the children at the hearing?

[¶27] Mother concedes that if a prehearing determination regarding the children's presence is not required, she has no due process claim arising from the timing of the determination. We therefore turn to her claim that not having DT and NT present at the permanency hearing violated her right to due process[3] and equal protection. Mother contends that "[t]he right to associate with one's family is a fundamental right." However, Mother fails to explain how her right to familial association translates to a due process right to have her children present at the permanency hearing.

[¶28] We recognize that Mother has "a due process right to meaningful participation at permanency hearings when the State seeks to change permanency from family reunification to another status that will require termination of parental rights." *KC*, 2015 WY 73, ¶ 38, 351 P.3d at 246. Mother was "entitled to put the State to its proof, to be present, to confront and cross-examine witnesses, to call witnesses, and to present a case in support of a continued plan of reunification or dismissal of the case." *Id*. at ¶ 44, 351 P.3d at 247. Mother was afforded these rights. Mother attended the permanency hearing, and her counsel made opening remarks, cross-examined the State's witness, called Mother as a witness, introduced exhibits, and made a closing argument. Mother did not call the children as witnesses, she did not object to the children not being present, and she did not question the State's witness about the children's preferences. There was no transgression of a clear and unequivocal rule of law, and Mother was denied no substantial right resulting in material prejudice. We find no plain error.

[¶29] Mother's remaining argument is that her equal protection rights were violated.[4] Other than referencing the United States Constitution and quoting article 1, section 2 of the Wyoming Constitution, Mother cites no case law and provides no analysis or argument on this issue. "We consistently have refused to consider arguments not supported by cogent argument and citation to legal authority." *Peak v. Peak*, 2016 WY 109, ¶ 11, 383 P.3d 1084, 1088 (Wyo. 2016) (citing *In re General Adjudication of All Rights to Use Water in Big Horn River System*, 2015 WY 104, ¶ 24, 355 P.3d 1222, 1228 (Wyo. 2015)).

---

[3] In her brief, Mother states: "The mother in this matter not only has personal standing to raise this issue, but may have the 'right to petition on behalf of the [children]' Wyo. Stat. Ann. § 14-3-402(a)(xvi)(E)." However, Mother fails to provide any authority or legal analysis supporting her right to petition on the children's behalf, or how the children's due process rights were violated, and her cursory references to the rights of the children do not adequately present an issue for this Court to rule on. "Where a party fails to present cogent argument supported by pertinent authority, we will not consider the matter." *In re "H" Children*, 2003 WY 155, ¶ 48, 79 P.3d 997, 1011 (Wyo. 2003).

[4] Mother begins her equal protection argument claiming it is her right that is violated and concludes the paragraph with the statement: "The children deserved equal protection under the law. They deserved the right to be heard." As with the due process argument on behalf of the children, this Court finds no valid authority or legal analysis supporting a claim that the children's equal protections rights were violated and will not consider the issue. *See In re "H" Children*, 2003 WY 155, ¶ 48, 79 P.3d at 1011.

***III. Was there sufficient evidence to support the juvenile court's change in the permanency plan from reunification to adoption?***

[¶30] Finally, Mother challenges the sufficiency of the evidence to support the juvenile court's finding that DFS could cease efforts of family reunification and change the permanency plan from reunification to adoption. We must determine whether the juvenile court abused its discretion. *Peak*, 2016 WY 109, ¶ 11, 383 P.3d at 1088.

> In assessing whether the juvenile court abused its discretion in changing the permanency goal from reunification to termination and adoption, we must evaluate the sufficiency of the evidence to support the court's decision. In evaluating the sufficiency of the evidence in a neglect proceeding, we measure the juvenile court's decision against the preponderance of the evidence standard.

*In re RE*, 2011 WY 170, ¶ 12, 267 P.3d 1092, 1096 (Wyo. 2011) (internal citations omitted). Our review of the sufficiency of the evidence is governed by the following principles:

> 1. [We] [g]ive considerable deference to the trial court's determination because it has the advantage to judge the demeanor and intelligence of the witnesses;
>
> 2. [We] [e]xamine the evidence in the light most favorable to appellee and resolve all conflicts in evidence for appellee; [and]
>
> 3. [We] [a]ssume as true the evidence in appellee's favor, disregard entirely appellant's evidence in conflict with appellee's evidence, and give to appellee's evidence every favorable inference that may fairly be drawn.

*KC*, 2015 WY 73, ¶ 18, 351 P.3d at 242 (quoting *In re MC*, 2013 WY 43, ¶ 30, 299 P.3d 75, 81 (Wyo. 2013) (alterations in original)). Additionally,

> [w]hen a child is adjudged to be neglected the court shall ensure that reasonable efforts were made by the department of family services to prevent or eliminate the need for removal of the child from the child's home or to make it possible for the child to return to the child's home. Before placing a child outside of the home, the court shall find by clear and

> convincing evidence that to return the child to the child's home would not be in the best interest of the child despite efforts that have been made[.]

Wyo. Stat. Ann. § 14-3-429(a)(iv) (LexisNexis 2015).

[¶31]   Mother argues that the juvenile court's order is improper because "[t]he testimony presented [at the permanency hearing] as to DFS's efforts focused on what mom was not doing, and not on what DFS provided as far as services or efforts they made." Mother contends that DFS did not prove it put forth reasonable efforts to provide her with the services necessary to successfully accomplish the goals in her case plan and achieve family reunification.

[¶32]   The minimum requirements set out in Mother's case plan were that she obtain housing and maintain a clean home, obtain employment, complete parenting classes, and complete an addiction severity index and follow any recommendations. The juvenile court also ordered Mother to participate in UA testing at the discretion of DFS. The evidence indicated that Mother completed the parenting classes, completed an ASI evaluation, and completed at least two negative UAs. However, she failed to obtain housing, maintain a clean home, obtain employment, follow the recommendations of the ASI evaluation to participate in an IOP program, and failed to continue court-ordered UAs.

[¶33]   The juvenile court found

> that all reasonable efforts to have reached the goal of reunification have been made in this case. Those efforts may now cease. They have failed, not on the back of the Department of Family Services, Guardian ad Litem[], or even on the attorney. They have failed on [Mother's] back, and she is responsible for that failure.

We defer to the credibility determination of the juvenile court, and examine the evidence in the light most favorable to the State. *See KC*, 2015 WY 73, ¶ 18, 351 P.3d at 242. The juvenile court found that Mother was not credible, and that DFS had made reasonable efforts to assist her in the goal of reunification. DFS agreed to allow Mother to do her UA testing at Pathfinder, where she could do both the UA testing and participate in the IOP program recommended by her ASI evaluation; yet Mother never followed through with the UA testing or the IOP program. DFS reminded Mother that it would pay for the UA testing; Mother did not show up. DFS spoke with the housing authority in an attempt to get Mother on the list to receive permanent housing; Mother failed to follow through. The DFS caseworker notified Mother of multiple job openings that she failed to pursue.

The court's finding that Mother failed to comply with her case plan despite DFS's reasonable efforts to assist her is supported by the record.

[¶34]  We find that the juvenile court did not abuse its discretion in ordering a change in the permanency plan for DT and NT.  The juvenile court's determination that to return the children to the children's home would not be in the best interest of the children despite efforts that had been made, is supported by the record and was proven by clear and convincing evidence.

## *CONCLUSION*

[¶35]  A determination whether the children should be present at a permanency plan hearing should be made prior to the hearing.  However, it was not plain error for the juvenile court to have made that determination after the hearing in this instance.  Mother's due process rights were not violated; thus we find no plain error.  In addition, the juvenile court's change in the permanency plan from reunification to adoption was supported by sufficient evidence.  We affirm.