KAUTZ, Justice.
*18 [¶1] GS (Father) appeals from the juvenile court's order changing the permanency plan for VS (the Child) from family reunification to adoption. Father asserts the juvenile court violated his right to due process at the permanency hearing by proceeding without him being present, taking judicial notice of the juvenile case file, and allowing the State of Wyoming to present information about the case by offer of proof. Father also claims the juvenile court abused its discretion when it changed the permanency plan without requiring the Department of Family Services (DFS) to make reasonable efforts to reunify the Child with him.
[¶2] We affirm.
ISSUES
[¶3] The issues on appeal are:
I. Did the juvenile court commit plain error and violate Father's due process rights when it held the permanency hearing without securing his attendance or testimony, took judicial notice of the juvenile court file, and allowed information about the case to be presented through offers of proof rather than sworn witness testimony?
II. Did the juvenile court abuse its discretion when it determined that DFS made sufficient efforts to reunify the family and it was in the Child's best interest to change the permanency plan from reunification to adoption?
FACTS
[¶4] The Child was born in 2006 to Father and EL (Mother). Father was incarcerated when the Child was born and remained in prison until shortly before November 2017. He has never met the Child. He is on parole in Alabama, living in unknown circumstances.
[¶5] In March 2016, the Laramie County district attorney filed a petition alleging Mother had neglected the Child because he had numerous unexcused absences and tardies at school. The Child initially was not taken into protective custody. However, DFS learned that the Child was actually residing with his maternal grandmother, who was gravely ill.
[¶6] Mother did not appear at either of two initial hearings, likely because there were active warrants for her arrest, but the court entered a denial on her behalf at the second initial hearing. The juvenile court placed the Child in DFS's legal custody and gave DFS and the guardian ad litem (GAL) discretion to determine physical custody. The juvenile court also ordered a Multi-Disciplinary Team (MDT) to convene, hold meetings and report to the court. When it became clear the maternal grandmother could not care for the Child, he was placed in foster care.
[¶7] On June 13, 2016, the juvenile court held an adjudicatory hearing on the allegation that Mother had neglected the child. Although her attorney was present, Mother again failed to appear. The court ruled Mother had neglected her son, and the Child was "a neglected child as defined by statute." In August 2016, DFS developed a case plan which Mother signed. The goal was family reunification with Mother. Many aspects of the plan required Mother to address her substance abuse issues. The case plan also required DFS to diligently search for Father, who had since been identified.
[¶8] DFS learned that Father was incarcerated in Alabama. On September 1, 2016, he was provided a form to request an attorney be appointed to represent him in the juvenile case. Father was not, however, considered a placement option because of his lengthy prison sentence.
[¶9] The MDT met on September 13, 2016, and neither parent attended the meeting, either in person or by phone. The MDT report said the Child was doing well in foster care, but Mother was not making progress on her case plan. She continued to use drugs and had been in jail. Father "was currently in prison in Alabama and would not be released until the year 2022." The DFS caseworker said she had not heard from him about the case. Despite Mother's noncompliance, the MDT recommended that the permanency *19 plan remain reunification with Mother.
[¶10] On September 23, 2016, an attorney was appointed to represent Father. Father filed a motion to appear by telephone at the disposition hearing scheduled for November 14, 2016. The juvenile court granted the motion and directed Father to call the court at the appointed time.
[¶11] At the disposition hearing, Mother and her attorney appeared in court. Father did not call in, but his attorney appeared in person. Father's attorney reported difficulty contacting Father at the Alabama prison, but said she was in contact with him via letters. There was discussion about Mother's lack of progress on her case plan and the possibility of developing a concurrent permanency plan in the event reunification was not successful. The district attorney discussed the option of placing the Child with a maternal aunt and uncle, and Father's attorney stated that Father's mother (the Child's paternal grandmother) might be a placement option. Mother's attorney acknowledged Mother's lack of progress on the case plan but said she wanted the "opportunity to prove herself and to reunite with her child."
[¶12] At the end of the disposition hearing, the juvenile court ruled the Child would remain in DFS custody and the permanency plan would remain family reunification with Mother. The court ordered Mother to comply with her case plan and directed the parties to appear for a hearing in one month. The juvenile court warned Mother that if she failed to make progress on her case plan, the court would consider changing the permanency plan. The court ordered DFS and the GAL to, in the meantime, "continue to look for family placement options." DFS's quarterly progress report essentially recited the facts developed at the November 14, 2016 disposition hearing.
[¶13] The MDT met on December 6, 2016, and neither Father nor Mother attended. The MDT report noted Mother still was not complying with her case plan, and the Child had not had any visits with Father's "side of the family." According to the MDT report, DFS had considered Father's mother and sister as possible placement options. However, Father's sister had never contacted DFS, and the DFS caseworker voiced concerns about the Child being placed with the paternal grandmother because she spoke only Spanish, while the Child spoke English, and she "did not know if she would be able to care for him." Father's attorney stated that she was gathering more information about Father's family for DFS. Father's attorney recommended a permanency plan of guardianship with Father's mother, and the rest of the MDT recommended that the permanency plan remain reunification with a concurrent plan of guardianship.
[¶14] The court considered the case at a status hearing on December 19, 2016, which Mother attended. Although Father had received permission to attend the hearing by telephone, he did not call until near the end of the meeting. The State requested that the court change the permanency plan to a concurrent plan of family reunification and guardianship, although suitable guardians were proving difficult to locate. The maternal aunt and uncle who had earlier been identified as a possible placement were still completing the requirements for a home study. The court approved the permanency plan of reunification with a concurrent plan of guardianship and found DFS had made reasonable efforts toward those goals.
[¶15] On September 20, 2017, DFS filed a quarterly progress report. The report stated that Mother had not complied with her case plan and had not attended visitation with the Child since February 2017. The Child's maternal aunt and uncle had apparently completed their study, moved to Cheyenne, and the Child was placed with them in May 2017. The Child flourished in the aunt and uncle's care. Father and his family supported guardianship being placed with the aunt and uncle. DFS recommended the permanency plan be changed to guardianship with the aunt and uncle.
[¶16] The MDT held a meeting on October 11, 2017, which Father attended by telephone and his attorney attended in person. Mother was in jail, and her attorney did not attend. The DFS caseworker stated that the Child was doing very well with his aunt and uncle *20 and wanted to remain with them. The MDT report stated that Father had been granted parole, but his release date was unknown. The DFS caseworker also said that Father sent the Child letters and pictures, but the Child did not want to respond.
[¶17] At the MDT meeting, Father stated he had changed his mind and now refused to consent to the aunt and uncle having guardianship of the Child. "[H]e wanted the opportunity to be a father since he never had the chance. [Father] stated he wanted to claim [the Child] if he could." His attorney, therefore, recommended that the Child be placed with Father upon his release from prison. The district attorney and the DFS caseworker recommended changing the permanency goal to termination of parental rights and adoption by the aunt and uncle.
[¶18] The court held a review hearing on October 23, 2017. Father appeared by telephone, and Mother did not appear. The district attorney, DFS and the GAL asked that the permanency plan be changed from family reunification to adoption. Mother's attorney was unsure of Mother's position on the permanency plan, so he asked for an evidentiary permanency hearing. Father's attorney agreed with the request for an evidentiary hearing because Father was opposed to the proposed change of the permanency plan.
[¶19] The juvenile court held a permanency hearing on November 17, 2017. Mother did not appear, but agreed to relinquish her parental rights. Father had been released from prison, and the juvenile court granted him permission to attend the hearing by telephone from Alabama. He did not, however, answer when the court called him. His attorney attended the hearing in person, and the juvenile court asked her whether Father had notice of the hearing, to which she responded:
He did, Your Honor.
It was my understanding that he would be ready to answer the phone call. I also explained to him that while it is set for 9 o'clock, these are stacked settings, so it may be 10 o'clock or 11 o'clock his time by the time he receives a call. So I have no explanation for his absence or his not answering the telephone.
[¶20] In light of Father's failure to appear for the evidentiary hearing, the State requested to present an offer of proof as to why the permanency plan should be changed from family reunification to adoption. The State also requested that the court take judicial notice of the juvenile court file and all the information contained therein. Father's attorney did not object to the State's proposed procedure or request a continuance to secure Father's attendance. The juvenile court declared Father in default with respect to the permanency hearing and stated that "a proffer would be an appropriate way for the State to proceed." It also agreed to "take judicial notice of the MDT reports and the other information that's contained within the Court's file with which this Court is very familiar."
[¶21] The State recited the history of the case and DFS's efforts to reunite the Child with Mother. The State explained that Father had recently been paroled and "wants the opportunity to try to reunify with his son." It was the State's position that "it is just too late" and the Child's best interests would be served by changing the permanency plan from family reunification to adoption by the aunt and uncle. The State noted there was no information about Father's living circumstances, Father had never met the Child, and the only contact between the two during the Child's entire life was some correspondence from Father to the Child. Father's attorney requested that the permanency plan be reunification with Father. She asserted Father should be given the opportunity to develop a case plan with DFS to meet the objective of reunification.
[¶22] The court asked the DFS caseworker about the case plan with Father. She stated "[i]t wasn't until the last MDT [meeting] that I had any notification that parole was even on the table." However, he did not have a "release date at that point." She said she had talked to Father "in the last couple of days" about a case plan. She told him the case plan would need to include a large amount of therapy since he and the Child had never met. After that conversation, she had no other contact with Father. The State requested *21 that DFS be relieved from further responsibility for making reasonable efforts to reunify the family, so it could proceed with termination of Father's parental rights and adoption.
[¶23] The GAL stated that other placement options, including Father's mother, had been explored prior to placing the Child with the maternal aunt and uncle who wanted to adopt him. She agreed with the State that Father's efforts came too late, especially since there was no bond between Father and the Child. The GAL asserted that the Child deserved the permanency of adoption.
[¶24] The juvenile court ruled:
[T]he Court agrees with the [GAL] and with the State in this matter, that the best interests of [the Child] have to trump the recent desire from [Father] to now establish a relationship with a child he's never met, never been there for, never provided for during the lengthy period of time that he has been incarcerated.
I do fully appreciate what the United States Supreme Court has said about the fundamental rights of parents to parent. And I also appreciate what our Wyoming Supreme Court has said in that regard as well. ...
But I believe it is in the best interests of [the Child] that the efforts now by [Father] to engage in a plan are just simply too late in the game.
This child is thriving and doing well in his placement. He needs stability. He needs a solid family. He needs people who are there for him now and who will provide for him and will care for him and will love him.
So I would find that reasonable efforts have been made by [DFS] to achieve the original permanency plan. They are relieved of those efforts for reunification.
The mother has failed miserably in her efforts to comply with her case plan, and [Father] simply has been absent. And it is too late at this point for [DFS] to engage in that process. It is counter to the best interests of [the Child] to do that. He needs that finality. So the permanency plan can be changed to termination of parental rights.
The juvenile court entered a written order stating that "reasonable efforts towards the permanency plan of family reunification have been made for the last twenty (20) months without success." The court concluded it was in the Child's best interest to change the permanency plan from family reunification to adoption and relieved DFS of the responsibility for further reunification efforts. Father filed his notice of appeal.
DISCUSSION
Due Process - Right to Meaningful Participation in the Permanency Hearing
[¶25] Father claims the juvenile court denied him due process at the permanency hearing by proceeding without securing his attendance and testimony, taking judicial notice of the juvenile court file, and allowing unsworn offers of proof or proffers in the place of witness testimony. The question of whether an individual was afforded due process is one of law, for which our review is de novo . ST v. State (In the Interest of DT), 2017 WY 36, ¶ 23, 391 P.3d 1136, 1143 (Wyo. 2017). However, Father did not raise this issue below or, in any way, object to the procedure employed by the juvenile court at the permanency hearing.[1]
Normally, we will not consider an issue raised for the first time on appeal, In re AGS , 2014 WY 143, ¶ 33, 337 P.3d 470, 480 (Wyo. 2014), but we have recognized "two exceptions to this rule: when the issue *22 raises jurisdictional questions or when the issue is of such a fundamental nature that it must be considered. Termination of parental rights 'affect the fundamental liberty of familial association.' A change in permanency plan is not termination; however, as we recognized in KC v. State , 2015 WY 73, 351 P.3d 236 (Wyo. 2015), the decision to halt reunification efforts certainly affects a parent's substantial rights, as it will likely have a significant impact on a termination decision. Id . at ¶ 38, 351 P.3d at 246 ("It is usually a foregone conclusion that once a permanency plan is changed from family reunification to adoption or other permanent placement outside the home, an action to terminate parental rights will eventually be filed.")
FH v. State (In the Interest of ECH), 2018 WY 83, ¶ 21, 423 P.3d 295, 302 (Wyo. 2018) (citation omitted). In KC v. State ( In the Interest of GC ), 2015 WY 73, ¶ 41, 351 P.3d 236, 247 (Wyo. 2015), we said that "[p]ermanency hearings, when there may be a change in the plan from reunification to termination of parental rights, implicate substantial rights and thus require meaningful due process."
[¶26] Father's claim that the juvenile court violated his right to due process at the permanency hearing raises a fundamental issue. We will consider the issue even though it was not raised below; however, our review is limited to a search for plain error. W.R.A.P. 9.05 ; FH, ¶ 21, 423 P.3d at 302.
"Plain error occurs when '1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right resulting in material prejudice.' Deeds v. State , 2014 WY 124, ¶ 21, 335 P.3d 473, 479 (Wyo. 2014) (citations omitted). 'The appellant bears the burden of proving plain error[.]' Id. "
ST, ¶ 23, 391 P.3d at 1143 (quoting In re AGS , 2014 WY 143, ¶ 34, 337 P.3d 470, 480 (Wyo. 2014) ).
[¶27] The first part of the plain error test is satisfied in this case. The record clearly reflects that Father was not present at the hearing and the juvenile court did not further act to secure his testimony. It is also clear that the court took judicial notice of the juvenile court file and heard information about the case through offers of proof rather than witness testimony.
[¶28] The second part of the plain error test requires a showing of a violation of a clear and unequivocal rule of law. The Wyoming constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law." Wyo. Const. Art. 1, § 6. See also , U.S. Const. Amend. V and XIV. In general, due process requires notice and an opportunity to be heard. DH v. Wyo. Dep't of Family Servs. (In re "H" Children), 2003 WY 155, ¶ 39, 79 P.3d 997, 1008 (Wyo. 2003). The required process varies depending upon "the nature of the proceeding and the interests involved." KC , ¶ 32, 351 P.3d at 245. Parents generally have the due process right to "meaningful participation" at permanency hearings "when the State seeks to change permanency from family reunification to another status that will require termination of parental rights." KC , ¶ 38, 351 P.3d at 246. Therefore,
if a change in permanency plan includes adoption or permanent placement other than reunification, the parents must have the right to request, and on request must be provided with, an evidentiary hearing.
Id., ¶ 42, 351 P.3d at 247. However, a parent must specifically request an evidentiary hearing because there may be instances where parents do not dispute a recommendation or are content with a non-evidentiary hearing. The failure to request an evidentiary hearing waives that right. Id.
[¶29] When a parent requests an evidentiary hearing, the following standards apply to the hearing:
The parent requesting a hearing is entitled to put the State to its proof, to be present, to confront and cross-examine witnesses, to call witnesses, and to present a case in support of a continued plan of reunification or dismissal of the case. Hearsay evidence that is probative, trustworthy and credible may be received at the hearing. ... [A]t the permanency hearing[,] the State has the burden of establishing by a preponderance *23 of the evidence that a change in the permanency plan is in the best interests of the child.
Id., ¶ 44, 351 P.3d at 247.
[¶30] Father claims the juvenile court violated the procedure mandated in KC for evidentiary permanency hearings by proceeding without him, taking judicial notice of the court file, including the MDT reports, and allowing information about the case to be presented through offers of proof rather than sworn testimony. What Father fails to recognize is the juvenile court did give him the opportunity to avail himself of all the procedural safeguards set out in KC , but he did not do so.
[¶31] Although the juvenile court granted him permission to appear by telephone, he did not answer when the court called. Father claims on appeal that it is reasonable to assume his phone never rang. We find nothing in the record to support that inference. His attorney said Father had notice of the hearing. See generally, Rule 2(e) of the Rules of Procedure for Juvenile Courts ("Prior to each hearing, the county or district attorney, or another entity designated by the court, shall provide written notice of such hearing to the parents (both custodial and non-custodial)[.]") She explained to the court that she had spoken with Father about the time of the hearing and did not know why he failed to answer. Furthermore, even if it were true that his phone did not ring when the court called, that does not explain why Father made no effort to contact the court. He had called into the court for hearings before, so he had the information necessary to initiate a call if he was not receiving calls. He also did not file anything with the court to explain his absence.
[¶32] Father stated at oral argument that Wyo. Stat. Ann. § 14-3-415(a) (LexisNexis 2017) compelled the juvenile court to "insure" his presence at the permanency hearing. Section 14-3-415(a), which was adopted by the legislature in 1997, states that "[t]he court shall insure the presence at any hearing of the parents, guardian or custodian of any child subject to the proceedings under this act." Father did not discuss or even cite § 14-3-415(a) in his brief. Instead, the statute apparently came to Father's attention when the State filed a Notice of Additional Authority, indicating its intent to rely upon FH , which discussed another aspect of the statute.[2] Father did not file a similar notice but, at oral argument, he argued for the first time that "insure" under § 14-3-415(a) means the juvenile court should have continued the hearing until he was present. He does not, however, show a clear and unequivocal rule of law exists that the juvenile court is required to continue a hearing or otherwise compel a parent to be present in order to meet the "insure the presence" requirement. Given there is no briefing on the meaning of the statutory language or how the statute interfaces with due process requirements, we will not determine, in this case, the scope of the juvenile court's responsibility under § 14-3-415(a) to "insure" a parent's presence at a permanency hearing.
[¶33] Turning to the procedure used in this case, Father claims the juvenile court should not have taken judicial notice of the case file. Under W.R.E. 1101(b)(3), the rules of evidence do not apply to juvenile proceedings, except adjudicatory hearings. Consequently, the juvenile court may consider hearsay evidence, such as the MDT reports, in making its permanency decision. See KC, ¶ 44, 351 P.3d at 247. Compare Wyo. Stat. Ann § 14-3-426(b) (LexisNexis 2017) ("Only competent, relevant and material evidence shall be admissible at an adjudicatory hearing to determine the truth of the allegations in the petition."); Wyo. Stat. Ann. § 14-3-427(h) (LexisNexis 2017) ("The court shall not consider any report or recommendation under this section prior to adjudication of the allegations in the petition without the consent of the child and the child's parents, guardian *24 or custodian.") In SLJ v. State (In the Interest of SJJ), 2005 WY 3, ¶ 38, 104 P.3d 74, 84 (Wyo. 2005), this Court held "use of the juvenile court records in [a] termination proceeding[ ] was entirely appropriate," even though those are two separate proceedings. Surely, then, use of the records in the same court proceeding would be appropriate.
[¶34] After the juvenile court declared Father in default because he failed to appear, the court, without objection from Father's attorney, allowed the State to make an offer of proof instead of presenting witness testimony. The State described the factual and procedural history of the case, including DFS's reunification attempts, and explained the grounds for its request to change the permanency plan to adoption. At the court's request, the DFS caseworker described her recent contact with Father about developing a case plan. The GAL also reviewed the facts and joined in the State's recommendation for a change in the permanency plan.
[¶35] Even though the juvenile court declared Father in default, it gave Father the opportunity to present his own offer of proof against the State's proposed change in the permanency plan. His attorney did not dispute the factual history recited by the State but argued the permanency plan should be reunification between Father and the Child and he should be given a chance to develop a case plan with DFS. There is nothing in the record indicating Father could not have offered witness testimony, asked that the State's witnesses be placed under oath and subject to cross examination, or provided an offer of proof of what Father's testimony would have been had he attended the hearing. See generally, In re A.J., 2017 WL 2493290, *3 (W.Va. 2017) (finding no error in dispositional hearing when the father consented to presentation of evidence by proffer and was not prevented from calling or cross-examining witnesses).
[¶36] Further, as we said in KC, ¶ 42, 351 P.3d at 247, if a parent does not request an evidentiary hearing, the court may conduct a non-evidentiary hearing for the purpose of changing a permanency plan. Offers of proof are proper ways to present information in a non-evidentiary setting. See, e.g. , Tracy v. Tracy, 2017 WY 17, ¶¶ 8, 34, 388 P.3d 1257, 1260, 1264 (Wyo. 2017). Father does not direct us to any rule which prohibits the juvenile court from conducting a non-evidentiary hearing when a parent who requests an evidentiary hearing fails to appear and his attorney acquiesces to the procedure.[3] Although the hearing in the case at bar did not meet the requirements for an evidentiary hearing, Father was provided with notice of the hearing and an opportunity to be heard, which are the hallmarks of due process. Father had the opportunity to meaningfully participate in the permanency hearing; therefore, the juvenile court did not violate a clear and unequivocal rule of law.
[¶37] Turning to the final part of the plain error test, Father has not established he was materially prejudiced by the procedure employed by the juvenile court at the permanency hearing. To establish material prejudice, Father must demonstrate a reasonable probability exists that, absent the error, he may have enjoyed a more favorable outcome. Osterling v. State, 2018 WY 95, ¶ 7, 424 P.3d 250, 252 (Wyo. 2018). Father does not explain how he would have received a more favorable outcome if the juvenile court had required the parties to follow the requirements for an evidentiary hearing. He does not direct us to any disputed facts that could have been explored through his or other witnesses' testimony, on cross-examination, or through the introduction of other *25 evidence. His failure to make any such allegations differentiates this case from KC, ¶¶ 14, 48, 351 P.3d at 241, 248, where the mother's attorney at least implied that she would have challenged the foundation of the laboratory test results contained in the MDT reports had she had the opportunity to do so. Additionally, as mentioned above, Father's attorney had the opportunity to bring to the juvenile court's attention any facts or circumstances she felt were relevant to the permanency decision. Father has not met his burden on the third part of the plain error test.
Reasonable Efforts to Reunify the Family
[¶38] Father claims the juvenile court incorrectly concluded that DFS made reasonable efforts to reunify the family before it changed the permanency plan to adoption. If DFS wishes to change a permanency plan from family reunification to adoption, it must demonstrate to the juvenile court that it made reasonable efforts to reunify the family but was unsuccessful. TW v. State (In the Interest of JW ), 2018 WY 22, ¶ 19, 411 P.3d 422, 426 (Wyo. 2018). We review the juvenile court's decision regarding the sufficiency of DFS's efforts using the abuse of discretion standard. TW, ¶ 20, 411 P.3d at 426. In conducting our review, we consider
the reasonableness of the court's determination and whether it was supported by a preponderance of the evidence. In analyzing the sufficiency of that evidence, we defer to the juvenile court's judgment, examining all evidence in the light most favorable to the State and resolving all evidentiary conflicts in its favor. We assume all of its evidence is true and disregard any contrary proof adduced by the parent challenging the juvenile court's decision.
Id. (citations omitted). To the extent we are called upon to interpret statutes, our review is de novo. DB v. State, (In the Interest of CRA), 2016 WY 24, ¶ 15, 368 P.3d 294, 298 (Wyo. 2016).
[¶39] Wyo. Stat. Ann. § 14-3-431(k)(i) (LexisNexis 2017) states:
(k) At the permanency hearing, the court shall:
(i) Determine whether the permanency plan is in the best interest of the child and whether the department of family services has made reasonable efforts to finalize the plan[.]
Wyo. Stat. Ann. § 14-3-440 (LexisNexis 2017) governs reunification efforts:
(a) Except as provided in W.S. 14-2-309(b) or (c), reasonable efforts shall be made to preserve and reunify the family:
(i) Prior to placement of the child outside the home, to prevent or eliminate the need for removing the child from the child's home; and
(ii) To make it possible for the child to safely return to the child's home.
(b) In determining what reasonable efforts shall be made with respect to a child and in making those reasonable efforts, the child's health and safety shall be the paramount concern.
(c) Reasonable efforts to place a child for adoption or with a legal guardian may be made concurrently with the reasonable efforts described in subsection (a) of this section.
...
(e) Reasonable efforts determinations shall include whether or not services to the family have been accessible, available and appropriate.
[¶40] Section 14-3-440(a) requires DFS to make reasonable efforts to "preserve and reunify the family." Father argues that DFS was required to make efforts to reunify the Child with him once he was released from prison. The State and the GAL counter that DFS was required to make reasonable efforts to accomplish the permanency goal which was reunification with Mother. They assert DFS was under no obligation to attempt to create a family unit between Father and the Child where none had previously existed and the efforts DFS made to involve Father in the Child's life were sufficient.
[¶41] When interpreting a statute, we seek the legislature's intent "as reflected in the plain and ordinary meaning of the words used in the statute." Butler v. State , 2015 WY 119, ¶ 7, 358 P.3d 1259, 1262 (Wyo. 2015) (citation omitted). We "give effect *26 to the 'most likely, most reasonable, interpretation of the statute, given its design and purpose.' " Adekale v. State , 2015 WY 30, ¶ 12, 344 P.3d 761, 765 (Wyo. 2015) (quoting Rodriguez v. Casey , 2002 WY 111, ¶ 20, 50 P.3d 323, 329 (Wyo. 2002) ). To accomplish this objective, we
construe each statutory provision in pari materia , giving effect to every word, clause, and sentence according to their arrangement and connection. To ascertain the meaning of a given law, we also consider all statutes relating to the same subject or having the same general purpose and strive to interpret them harmoniously. We presume that the legislature has acted in a thoughtful and rational manner with full knowledge of existing law, and that it intended new statutory provisions to be read in harmony with existing law and as part of an overall and uniform system of jurisprudence. When the words used convey a specific and obvious meaning, we need not go farther and engage in statutory construction.
TW, ¶ 12, 390 P.3d at 360 (quoting Cheyenne Newspapers, Inc. v. Bd. of Trustees of Laramie Co. Sch. Dist. No. One, 2016 WY 113, ¶ 10, 384 P.3d 679, 683-84 (Wyo. 2016) ) (other citations omitted).
[¶42] The Merriam-Webster Dictionary defines "preserve," for our purposes, as to "maintain" or keep intact. "Reunify" is defined as "to unify again" or to "be brought into a unit or coherent whole after a period of separation." Both terms - preserve and reunify - presuppose the existence of a family unit. Section 14-3-440(a) confirms that reunification efforts are aimed at preventing removal of the child from the home or making it possible to return the child to his home. Again, this statutory language references a preexisting home and family.
[¶43] Section 14-3-440(b) requires that the child's health and safety be the paramount concern in determining what efforts are required. To that end, "timely placement of children in accordance with a permanency plan may take precedence over family reunification, and reunification efforts inconsistent with the permanency plan may be discontinued." CP v. State (In re NDP), 2009 WY 73, ¶ 21, 208 P.3d 614, 619 (Wyo. 2009). See also, § 14-3-431(d) (the juvenile court must conduct a permanency hearing no later than twelve months after the child's removal from the home).
[¶44] Father asserts DFS's policies required it to make efforts to reunify him with the Child, pointing specifically to Department of Family Services, Protective and Juvenile Services Policy Manual, Policies 1.6 and 2.4. Policy 1.6 pertains to case plans, which are documents created in partnership with family members. Under the policy, case plans are required for all open cases and shall be developed with all family members, "including non-custodial and/or incarcerated parent[s]." Policy 1.6(B)(1)(b). When the child is placed outside the home, the case plan must identify a permanency goal and include information about the safety and risk factors for the family, the presenting issue that brought the family to DFS's attention, the strengths and needs of the family, the most appropriate placement plan, whether a concurrent plan is necessary, and services and supports needed to meet the permanency plan. Policy 1.6(B)(1)(b) and 1.6(B)(2).
[¶45] DFS Policy 2.4 addresses preserving connections. The purpose of the policy is to "help preserve the continuity of family relationships and connections" for families involved with DFS. Like the statutes discussed above, the policy focuses on preexisting relationships. The policy specifically addresses incarcerated parents:
Child(ren)/youth have a right to a lifelong relationship with his/her parent(s). Some of the parents with whom DFS works are incarcerated in jails or prisons. Unless parental rights have been terminated or otherwise ordered by the court, DFS shall make reasonable effort to reunify child(ren)/youth with his/her parents; engage parent(s) in planning for his/her child(ren)/youth; help child(ren)/youth maintain contact with his/her parent(s); and provide services to parent(s) regardless of his/her incarceration.
Policy 2.4(A).
[¶46] To accomplish these objectives, DFS is required to diligently locate and involve *27 "noncustodial/absent parent(s)." Policy 2.4(B)(10). See also, Policy 1.6(B)(2)(j)(5). DFS is also required to encourage visitation between the child and his parents, including incarcerated parents; however, visitation may be by means other than in person, such as through letters and pictures. Policy 2.4(B)(5). When a parent is incarcerated, DFS must, if possible, make contact with the parent, assist his involvement in the juvenile proceeding, work with the parent to identify relatives and kin, and develop a case plan. Policy 2.4(B)(13).
[¶47] The juvenile court properly concluded at the permanency hearing that the State had proven DFS made reasonable efforts to reunify the family for twenty months, without success. DFS's primary legal obligation was to reunify the existent family. The record clearly shows DFS tried to reunite the Child with Mother, but she failed to comply with her case plan.
[¶48] Father has never met the Child and has been in prison for the vast majority of the Child's life. The parties believed Father would not be released from prison until 2022, at which point the Child would have been sixteen years old. Thus, no one believed Father would be released in time to be a placement option. Despite this circumstance, DFS tried to involve Father by looking for a suitable placement for the Child within his family. It considered Father's mother and sister for placement. However, Father's sister did not contact DFS, and there was concern among the MDT about placing the Child with the paternal grandmother because she lived in Alabama, her primary language was Spanish while the Child spoke only English, and the grandmother did not know if she would be able to care for him. In the end, the paternal grandmother decided not to pursue custody of the Child because he was in a good placement with his maternal aunt and uncle.
[¶49] DFS also facilitated communication between the Child and Father. Compare, BA v. Laramie County Dep't of Family Servs. (In the Interest of FM), 2007 WY 128, ¶¶ 13-14, 163 P.3d 844, 848 (Wyo. 2007) (in parental rights termination case, DFS did not make reasonable efforts to reunify the family, in part, because it did not facilitate communication between the mother and the child). The only efforts Father made to connect with the Child were sending him some letters and pictures/drawings, which the Child did not want to see. There is no evidence in the juvenile court record that Father, in any way, supported the Child or offered any assistance to Mother. In addition, there is absolutely no evidence that Father was able to care for the Child upon his release. To the contrary, the information before the MDT and the juvenile court was that Father had no relationship of any sort with the Child.
[¶50] Although Father never signed a case plan, the case plan signed by Mother did reference him, and the MDT reports describe DFS's efforts to work with him. DFS began the process to create a case plan with Father when he was released from prison, but it was not completed before the permanency hearing. Under DFS Policy 1.6 and DFS Policy 2.4, DFS should have included him in the case planning process earlier. See also, TW, ¶ 24, 411 P.3d at 426-27 ; AA v. State (In the Interest of HP) , 2004 WY 82, ¶ 26, 93 P.3d 982, 990 (Wyo. 2004) (case plans for parents in prison). However, it is hard to imagine how this failure prejudiced him. Given the information known to DFS, i.e., that he had never met the Child, he was imprisoned over a thousand miles away, and he was not supposed to be released until 2022, there is no indication that DFS could have done more than it did. Moreover, Father does not identify what services should have been provided while he was still in prison that were not.
[¶51] Father seems to think DFS should have started anew with reunification efforts after he was released from prison. There is nothing to support the notion that DFS was required to ignore the preceding twenty months that the Child was in its custody and start over. Even if that were true, Father's actions after being released demonstrate a lack of interest in developing a relationship with the Child. After Father and the DFS caseworker discussed the requirements for a case plan, he did not even bother to attend the permanency hearing or explain his absence. The sheer length of time the Child had been in DFS custody and the need to find a *28 permanent solution for him undermines Father's position. See generally, CP, ¶ 31, 208 P.3d at 621.
[¶52] The record contains no evidence of any bond whatsoever between Father and the Child. There was simply no family relationship between the two which DFS could reunify. These circumstances distinguish the case at bar from other cases where DFS made more efforts to reunite a child with a parent who was in prison. For example, in TW, ¶ 16, 411 P.3d at 425, even though the father was in prison, DFS made significant efforts to reunify the children with him because there was a preexisting family bond.
[¶53] The record also supports the juvenile court's determination that it is in the Child's best interest to change the permanency plan to adoption.[4] See § 14-3-431(k) ; JO v. State (In the Interest of RE), 2011 WY 170, ¶ 10, 267 P.3d 1092, 1096 (Wyo. 2011) (the best interest of the child is at the heart of the permanency decision). The Child was doing well in the aunt and uncle's care and he wanted to remain with them. He had already been in the State's custody for twenty months and was eleven years old. Furthermore, there is no evidence in the record that Father had any ability to provide for the Child. Under these circumstances, the juvenile court properly recognized the Child's right to stability and permanency outweighed Father's desire to eventually parent the Child he had never provided for or even met. See CL v. Wyo. Dep't of Family Servs. (In re A.D.), 2007 WY 23, ¶ 31, 151 P.3d 1102, 1109 (Wyo. 2007).
[¶54] The juvenile court did not abuse its discretion by changing the permanency plan for the Child from family reunification to adoption. DFS established, by a preponderance of the evidence, that it made reasonable, though ultimately unsuccessful, efforts toward family reunification and it was in the Child's best interest to change the permanency plan to adoption.
[¶55] Affirmed.

Father claims there was no logical place at the hearing for his attorney to object. He asserts, therefore, that the entire proceeding was so flawed it amounted to structural or fundamental error. We disagree. Father's attorney could have requested a continuance or otherwise objected to proceeding in Father's absence when she and the judge were discussing his failure to answer the call. The obvious time for Father's attorney to object to the procedure was when the State asked the juvenile court's permission to proceed via offer of proof and to take judicial notice of the court file. Given we do not agree that the entire proceeding was so flawed that Father's attorney could not object, we will not discuss structural or fundamental error or the applicability of that principle of law in a juvenile case.

We discussed the presence requirement in FH, ¶¶ 42-46, 423 P.3d at 307-09, which was decided after the briefing in this case had concluded. The father in FH claimed that the juvenile court violated § 14-3-415(a) and his right to due process when it denied his motion to be transported from prison to the court for the permanency hearing. We said that the "presence" requirement under the statute and due process were satisfied by allowing the father to participate by telephone while his attorney was present in the courtroom. FH, ¶¶ 45-46, 423 P.3d at 308-09.

Much of Father's argument centers upon whether an offer of proof or proffer is a proper means of presenting evidence at an evidentiary hearing. In general, an offer of proof is a procedural mechanism used to give the court information about proposed evidence so that it can make a determination as to its admissibility and to create a record for appellate review. See, e.g ., Garland v. State, 2017 WY 102, ¶ 23, 401 P.3d 480, 486 (Wyo. 2017). In this case, the offers of proof or proffers included reviews of the factual and procedural history of the case and argument about the legal effect of that history. See Tracy, supra. Given we conclude the juvenile court was not required, under the circumstances of this case, to conduct an evidentiary hearing, we need not determine whether an offer of proof would be an appropriate means of presenting evidence at an evidentiary hearing.

The juvenile court found the State had proven it was in the Child's best interest to change the permanency plan by clear and convincing evidence. The State, however, was only required to make the showing by a preponderance of the evidence, which is a lesser standard. KC, ¶ 55, 351 P.3d at 249. See also, J.J.F. v. State, 2006 WY 41, ¶ 9, 132 P.3d 170, 174 (Wyo. 2006) (comparing lower preponderance of evidence standard of proof with higher clear and convincing evidence standard of proof).