This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                    **No. A-1-CA-35413**

**JEREMY LUKAS SANCHEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Fernando R. Macias, District Judge**

Hector H. Balderas, Attorney General
Santa Fe, NM
Walter M. Hart III, Assistant Attorney General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Nina Lalevic, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**VARGAS, Judge.**

{1}     Defendant Jeremy Lukas Sanchez was convicted of aggravated assault upon a peace officer, arson, and criminal damage to property. Defendant appeals his

convictions, raising the following issues: sufficiency of the evidence, ineffective assistance of counsel, improper jury instruction, and double jeopardy. We affirm.

**BACKGROUND**

{2}     This case arises from an incident at a motel in Las Cruces, New Mexico. The motel's clerks called into dispatch after Defendant repeatedly pressed a panic button in his motel room. As Officer Peter Bradley arrived on the scene, he was notified by dispatch that Defendant was calling 911 but would hang up without speaking. Officer Bradley was in his fully-marked police vehicle, wearing his full uniform with a cloth badge attached with Velcro onto the uniform. Officer Bradley went to Defendant's room, which was located on the ground floor; the motel room door opened directly into the parking lot and there were two windows located near the door. After the officer knocked on the door, Defendant asked who was there. The officer identified himself, informed Defendant he was with the police department, and explained he was "there to make sure everybody was okay." Officer Bradley asked Defendant to open the door, but Defendant did not respond.

{3}     After receiving no response from Defendant, Officer Bradley continued knocking on the door. Officer Bradley eventually heard some muffled yelling, followed by "what sounded like . . . some sort of metal striking the floor." The officer continued knocking on the door and announcing "police department," but Defendant did not respond. Another officer, Officer Bobby Jaramillo, arrived on

the scene, also wearing his uniform and badge. Officer Bradley asked Officer Jaramillo to retrieve the key to Defendant's room. Officer Bradley "continued knocking on the door and announcing "police department," to which Defendant would yell, "I don't believe you. I don't believe you are a police officer." In response, Officer Bradley removed his badge and held it up to the peephole, explaining that he was a police officer and that Defendant could look through the peephole to see the badge. The officer then heard movements toward the door, but did not know if Defendant looked through the peephole.

{4}  Once Officer Jaramillo returned with an electronic key to Defendant's room, the officers used the key and attempted to open the door, but the door was dead-bolted shut. Officer Bradley again knocked on the door, announced "police department," and tried opening the door with the electronic key, but was unsuccessful. The officers continued knocking on the door and announcing "police department," but Defendant repeatedly stated, "I don't believe you." The motel clerk provided the officers with a "hard key" to open the dead bolt, but the door would still not open. As a result, the officers requested that additional officers bring a battering ram and a ballistic shield. The officers also requested assistance from the fire department.

{5}  Approximately forty-five minutes later, officers brought a ballistic shield and battering ram, which Officers Edward Villareal and Jonathan Boehne, both

3

wearing their uniforms and badges, used. Officer Boehne struck the door with the battering ram, eventually opening it. As soon as the door opened, it "bounced right back at him," which the officers believed to be caused by something barricading the door or someone standing on the other side of the door. Officer Bradley then kicked the door, but it again bounced back. Officer Boehne then broke the windows located near the door, at which point an officer pulled the drawn curtains and Officer Jaramillo observed Defendant pressing against the door with his left shoulder, clenching his left hand, and holding a large, military-style knife in his right hand.

{6} Upon seeing Defendant holding the knife, Officer Jaramillo yelled "knife" to warn the other officers. At the same time, Officer Bradley "threw [his] shoulder into" the door, finally opening it. The door to Defendant's room opened into the bedroom area, which connected to a bathroom through a small hallway in the far-right corner of the room. As Officer Bradley pushed the door open, Defendant was standing six to eight feet away, in the center of the room, facing Officer Bradley, and "tightly" holding the knife in his right hand at a ninety-degree angle away from his body. Defendant was leaning slightly forward, standing with his shoulders rolled forward, his "arms coming to the center line," and his feet at a wide stance. Officers Bradley and Villareal described Defendant's posture as "aggressive" and a "fighter's stance." Officer Bradley testified that he "was actually very afraid that

4

[Defendant] was going to rush at [him] with the knife." Officer Villareal testified that he thought Defendant could have taken "some sort of lethal action, some deadly force." Defendant began "screaming" at the officers, exclaiming, "You're not the police." The officers repeatedly told Defendant to drop the knife, but Defendant responded by yelling that they were not police officers.

{7}    As Officer Bradley was raising his rifle to defend himself, another officer fired a foam projectile at Defendant, causing Defendant to drop the knife. Defendant then turned his body, grabbed the knife, and ran into the bathroom. After the officers yelled at Defendant to come out of the bathroom, they heard "a lot of banging" in the bathroom. Defendant threw the bathroom mirror into the small hallway, causing the mirror to break into jagged pieces of glass, and poured what appeared to be shampoo or body wash onto the broken glass. Officer Bradley testified that this conduct was consistent with an attempt to make the glass "extremely sharp" and "slick," which is "a very common plan that's used by individuals who are attempting to limit the ingress of officers or correction officers into any kind of an area." Defendant then "screamed out at [the officers] that he was going to die and he was going to take one of [them] with him and for [the officers] to come and get him." The officers did not go into the bathroom because they feared that doing so would result in injury either to an officer or to Defendant.

5

**{8}** While Defendant was in the bathroom, he created a hole in the wall between the bathroom and bedroom. Through the hole, the officers saw an orange flicker, followed by a flame. Using fire extinguishers, the officers sprayed into the hole and put out the fire. Despite the officers' instructions, Defendant did not leave the bathroom. Instead, Defendant asked the officers to hear their radios, at which point some of the officers turned up their radios as loud as possible. Dispatch then conducted a "welfare check" on the officers, with each officer responding, through their radios. Officer Bradley showed Defendant his badge, and another officer threw a large patch on the back of his vest that said "Police" into the bathroom.

**{9}** During this exchange, however, Defendant stated that he did not believe the police officers were police officers. As the officers continued to instruct Defendant to leave the bathroom, Defendant used either the broken mirror's metal lining or a towel rod to pull clothing and other objects into the bathroom to use as fuel for another fire. Because the officers were unable to put out this fire with the fire extinguisher, the fire department came and used a hose to put out the fire. While the fire department was using the hose, they accidentally sprayed a table, sending it toward Defendant. Defendant grabbed the table, disassembled it, and used it as a tool in an attempt to break through the wall into an adjacent room.

**{10}** After speaking with a hostage negotiation team, Defendant emerged from the bathroom and was taken into custody. Upon reviewing the damage, the hotel

6

manager observed that, in addition to the damage described above, Defendant removed a toilet embedded in the bathroom wall, which resulted in flooding and water damage in a nearby room, and pulled out a light fixture located inside his room's shower. While speaking with an investigator for the Las Cruces Fire Department after the investigator "wrapped up the scene," Defendant stated, "[H]e had started the fire because he wanted to get the officers out of the room[.]"

**{11}**     Defendant was charged with aggravated assault upon a peace officer, arson, and criminal damage to property. Following a jury trial, Defendant was convicted on all counts. Defendant appeals his convictions.

## I.     DISCUSSION

## A.     Sufficiency of the Evidence

**{12}**     Defendant first argues that his conviction for aggravated assault upon a peace officer was not supported by sufficient evidence. "In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (internal quotation marks and citation omitted). "In that light, the Court determines whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). "Contrary evidence supporting acquittal does not provide a

basis for reversal because the jury is free to reject [the d]efendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. "When a defendant argues that the evidence and inferences present two equally reasonable hypotheses, one consistent with guilt and another consistent with innocence, our answer is that by its verdict, the jury has necessarily found the hypothesis of guilt more reasonable than the hypothesis of innocence." *State v. Montoya*, 2005-NMCA-078, ¶ 3, 137 N.M. 713, 114 P.3d 393. "The jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *Holt*, 2016-NMSC-011, ¶ 20 (alterations, internal quotation marks, and citation omitted).

{13}     To convict Defendant of aggravated assault against a peace officer, the jury was instructed, in relevant part, that it had to find beyond a reasonable doubt that:

>     3.     [D]efendant knew Peter Bradley was a peace officer or Edward Villareal was a peace officer;
>
>     4.     [D]efendant's conduct caused Peter Bradley or Edward Villareal to believe [D]efendant was about to intrude on Peter Bradley or Edward Villareal's bodily integrity or personal safety by touching or applying force to Peter Bradley or Edward Villareal in a rude, insolent or angry manner;
>
>     5.     [D]efendant's conduct: threatened the safety of Peter Bradley or Edward Villareal; or challenged the authority of Peter Bradley or Edward Villareal;
>
>     6.     A reasonable person in the same circumstances as Peter Bradley or Edward Villareal would have had the same belief[.]

8

*See* UJI 14-2202 NMRA.

{14} Defendant first contends that the evidence was insufficient to support the finding that Defendant knew Officers Bradley and Villareal were peace officers. "[K]nowledge of the victim's identity as a peace officer is an essential element of . . . aggravated assault upon a peace officer[.]" *State v. Nozie*, 2009-NMSC-018, ¶ 30, 146 N.M. 142, 207 P.3d 1119. "[I]t is the defendant's mental state, rather than the victim's conduct, that is the touchstone of the knowledge requirement." *Id.* ¶ 32. "However, because an individual's intent is seldom subject to proof by direct evidence, intent may be proved by circumstantial evidence." *Id.* (alteration, internal quotation marks, and citation omitted). "Such circumstantial evidence may include, but is not limited to, the fact that the victim was in full uniform, had a badge visibly displayed, was driving a marked police vehicle, or had identified himself or herself as a peace officer." *Id.*

{15} At the time of the incident, Officers Bradley and Villareal were in full uniform, wore their badges, and repeatedly identified themselves as peace officers. This circumstantial evidence supports the jury's finding beyond a reasonable doubt that Defendant knew Officers Bradley and Villareal were peace officers. Indeed, when the Las Cruces Fire Department investigator asked Defendant why he started the fire in the bathroom, Defendant responded that he "wanted to get *the officers* out." (Emphasis added.) Viewing the evidence in the light most favorable to the

guilty verdict, we conclude the evidence was sufficient to support the finding that Defendant knew Officers Bradley and Villareal were peace officers.

{16}    Defendant also contends there was insufficient evidence to support the finding that either Officer Bradley or Officer Villareal *reasonably* believed that Defendant was going to intrude on their bodily integrity or personal safety. To support his argument, Defendant points out that the officers testified that they feared Defendant was going to move toward them or "take some other form of action[,]" but he did neither. Additionally, Defendant argues the officers' fears were unreasonable because Officer Villareal had a ballistic shield, Officer Bradley had a rifle, and officers with rifles and other equipment assisted them. However, Officer Jaramillo testified that when they used a battering ram to break the door down, Defendant was pushing against the other side of the door with his shoulder, holding a knife in his right hand. After Officer Bradley pushed the door open, Defendant was six to eight feet away, standing in an "aggressive" or "fighter's stance," holding a large military knife in his right hand. Rather than dropping the knife after the officers' repeated commands to do so, Defendant yelled at the officers that they were not police officers.

{17}    While Defendant would have this Court hold that the officers' fears stemming from these events were unreasonable, we defer to the jury's determination regarding the officers' credibility and the reasonableness of their

10

fear. *See Rojo*, 1999-NMSC-001, ¶ 19 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts."); *State v. Simmons*, 2018-NMCA-015, ¶¶ 13, 20, 409 P.3d 1030 (explaining that "we defer to the fact-finder when it weighs the credibility of witnesses and resolves conflicts in witness testimony[,] . . . [a]nd we do not re-weigh the evidence to determine if there was another hypothesis that would support innocence" (internal quotation marks and citations omitted)). Viewing the evidence in the light most favorable to the guilty verdict, we conclude the evidence was sufficient to support the finding that the officers reasonably believed that Defendant was going to intrude on their bodily integrity or personal safety.

**B.    Ineffective Assistance of Counsel**

{18}    Defendant next argues that trial counsel was ineffective. "Criminal defendants are entitled to reasonably effective assistance of counsel[.]" *State v. Crocco*, 2014-NMSC-016, ¶ 12, 327 P.3d 1068 (internal quotation marks and citation omitted). "To establish a prima facie case of ineffective assistance, a defendant must first show that counsel's performance fell below that of a reasonably competent attorney." *State v. Barela*, 2018-NMCA-067, ¶ 17, 429 P.3d 961 (alteration, internal quotation marks, and citation omitted), *cert. denied*, 2018-NMCERT-___ (No. S-1-SC-37184, Aug. 29, 2018). "Second, a defendant must

11

show that counsel's deficient performance prejudiced the defense such that there was a reasonable probability that the outcome of the trial would have been different." *Id.* (internal quotation marks and citation omitted). "Our Supreme Court has expressed a preference for bringing ineffective assistance claims through habeas corpus proceedings, rather than on direct appeal." *Id.* (internal quotation marks and citations omitted). "If facts necessary to a full determination are not part of the record, an ineffective assistance claim is more properly brought through a habeas corpus petition, although an appellate court may remand a case for an evidentiary hearing if the defendant makes a prima facie case of ineffective assistance." *Id.* (internal quotation marks and citation omitted).

{19} Defendant first argues that trial counsel was ineffective in failing to request a lesser-included offense instruction on aggravated assault. We note that "[c]ounsel's choice of defenses will not be disturbed unless the choice appears wholly unreasoned or deprives the defendant of his only defense." *State v. Baca*, 1993-NMCA-051, ¶ 34, 115 N.M. 536, 854 P.2d 363. Based on the limited record before us, we cannot say trial counsel's decision not to request a lesser-included offense instruction was wholly unreasoned. *See State v. Montoya*, 2017-NMCA-033, ¶ 10, 392 P.3d 223 (rejecting a defendant's contention that trial counsel's failure to request a lesser-included offense instruction demonstrated a deficiency because "[c]ounsel may have consciously determined that the better strategy was to

12

defeat the [charged offense] leaving no step-down charge"), *cert. denied*, 2017-NMCERT-___ (No. S-1-SC-36280, Feb. 24, 2017). Nor did trial counsel's decision deprive Defendant of his only defense, as trial counsel also argued that Defendant "did not know he was dealing with the police[.]" We therefore cannot say trial counsel's failure to request a lesser-included offense instruction deprived Defendant of his only defense. *See Baca*, 1993-NMCA-051, ¶ 34 (citing a trial counsel's failure to tender jury instructions on a defendant's sole defense, thus resulting in no presentation of a defense to the jury, as an example of counsel depriving the defendant of his only defense).

{20}     Defendant next argues that trial counsel was ineffective in failing to call an expert to testify regarding Defendant's mental health at the time of the incident. "We note that our Supreme Court has 'expressly rejected the contention that the failure to introduce the testimony of an expert witness constitutes ineffective assistance of counsel per se.' " *State v. Quinones*, 2011-NMCA-018, ¶ 34, 149 N.M. 294, 248 P.3d 336 (quoting *Lytle v. Jordan*, 2001-NMSC-016, ¶ 44, 130 N.M. 198, 22 P.3d 666). Likewise here, Defendant has failed to provide any indication as to whether an expert was available to testify as well as the content of the expert's testimony. *See Quinones*, 2011-NMCA-018, ¶ 34 (concluding a defendant did not make a prima facie case of ineffective assistance of counsel because there was "nothing in the record to indicate that a defense expert was

13

actually available to testify in support of [the d]efendant at trial and what the content of the expert's testimony would have been").

{21} Defendant's reliance on *State v. Aragon*, 2009-NMCA-102, 147 N.M. 26, 216 P.3d 276, is misplaced. There, we concluded the defendant demonstrated a prima facie case of ineffectiveness "based on [counsel's] failure to engage an expert for consultation, combined with her failure to conduct adequate pre-trial interviews of the [s]tate's experts." *Id.* ¶ 15. While expert testimony was the "crux" of the state's case in *Aragon*, *id.* ¶ 12, here, the State did not rely on expert testimony at all.

{22} We therefore conclude that Defendant has not demonstrated a prima facie case of ineffective assistance of counsel. Our holding today does not preclude Defendant from pursuing these arguments and developing a proper record in habeas corpus proceedings.[1] *See State v. Bernal*, 2006-NMSC-050, ¶ 36, 140 N.M. 644, 146 P.3d 289.

**C. Jury Instruction**

---

[1] Relying on out-of-state and federal precedent, the State requests we determine as a matter of law that failure of defense counsel to request a lesser-included offense jury instruction can never amount to ineffective assistance. This Court and our Supreme Court have in the past entertained such ineffective assistance of counsel claims on their merits. *See State v. Baca*, 1997-NMSC-059, ¶¶ 23-30, 124 N.M. 333, 950 P.2d 776; *State v. Jensen*, 2005-NMCA-113, ¶¶ 12-16, 138 N.M. 254, 118 P.3d 762. We decline the State's invitation to depart from this precedent.

14

{23} Defendant also argues the district court erred by instructing the jury on how to determine the amount of damage related to criminal damage to property because the given instruction was confusing. In particular, Defendant argues the jury instruction did not make the two alternative methods of determining the amount of damage clear to the jury. "The standard of review we apply to jury instructions depends on whether the issue has been preserved." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134. "If the error has been preserved we review the instructions for reversible error." *Id.* "If not, we review for fundamental error." *Id.* "Under both standards we seek to determine whether a reasonable juror would have been confused or misdirected by the jury instruction." *Id.* (internal quotation marks and citation omitted). The parties dispute whether Defendant preserved the jury instruction issue. Because the standard of review is not outcome determinative, we assume for purposes of this appeal that Defendant adequately preserved this issue for appeal, and we review the instruction on the amount of damage for reversible error.

{24} To convict Defendant of criminal damage to property, the jury was instructed it must find beyond a reasonable doubt that Defendant damaged another's property, and that "[t]he amount of damage to the property was more than $1000[.]" The jury was instructed that "amount of damage" meant:

> [T]he difference between the price at which the property could ordinarily be bought or sold prior to the damage and the price at

15

which the property could be bought or sold after the damage. If the cost of repair of the damaged property exceeds the replacement cost of the property, the value of the damaged property is the replacement cost.

*See* UJI 14-1510 NMRA.

{25} UJI 14-1510 provides two alternative methods for determining the amount of damage: "The first method is the diminution in the value of the property due to the damage, or the 'before and after value.' The second method is the cost of repair or replacement, whichever is less." *State v. Cobrera*, 2013-NMSC-012, ¶ 8, 300 P.3d 729 (citations omitted). This Court has explained that "[w]hile [UJI 14-1510] could be more clear in separating the two methods of determining amount of damages and describing them as alternatives, it is not so unclear that the jury is left without guidance." *State v. Barreras*, 2007-NMCA-067, ¶ 7, 141 N.M. 653, 159 P.3d 1138. In light of this reasoning, we see no deficiency in the given instruction and we are not persuaded that a reasonable juror would have been confused or misdirected by the instruction. Accordingly, we conclude the district court did not err in providing the jury with the given instruction.

**D.    Double Jeopardy**

{26} Defendant's final argument is that his convictions for arson and criminal damage to property violate the prohibition against double jeopardy. The United States and New Mexico Constitutions prohibit any person from being "twice put in jeopardy" for the same offense. U.S. Const. amend. V; N.M. Const. art. II, § 15.

16

"Double jeopardy presents a question of law, which we review de novo." *State v. Sotelo*, 2013-NMCA-028, ¶ 18, 296 P.3d 1232 (internal quotation marks and citation omitted). The double jeopardy prohibition against multiple punishments "relates to two general categories of cases: cases in which a defendant has been charged with multiple violations of a single statute based on a single course of conduct, known as 'unit of prosecution' cases; and cases in which a defendant is charged with violations of multiple statutes for the same conduct, known as 'double-description' cases." *State v. DeGraff*, 2006-NMSC-011, ¶ 25, 139 N.M. 211, 131 P.3d 61. Defendant raises a double-description argument that his convictions for arson and criminal damage to property were based on the same conduct.

{27}   Our Supreme Court adopted "what is generally a two-part inquiry for double-description claims, first analyzing whether the conduct underlying the offenses is unitary, *i.e.*, whether the same conduct violates both statues, and, if so, proceeding to analyze whether the [L]egislature intended to create separately punishable offenses." *State v. Gutierrez*, 2011-NMSC-024, ¶ 51, 150 N.M. 232, 258 P.3d 1024 (internal quotation marks and citation omitted). "Only if the first part of the test is answered in the affirmative, and the second in the negative, will the double jeopardy clause prohibit multiple punishment in the same trial." *Swafford v. State*, 1991-NMSC-043, ¶ 25, 112 N.M. 3, 810 P.2d 1223.

17

**{28}** "Separate punishments are permissible and conduct is not unitary if the offenses are separated by sufficient indicia of distinctness." *State v. Ford*, 2007-NMCA-052, ¶ 12, 141 N.M. 512, 157 P.3d 77 (internal quotation marks and citation omitted). "To determine whether a defendant's conduct was unitary, we consider such factors as whether the acts were close in time and space, their similarity, the sequence in which they occurred, whether other events intervened, and a defendant's goals for and mental state during each act." *Id.* "The conduct question depends to a large degree on the elements of the charged offenses and the facts presented at trial." *State v. Franco*, 2005-NMSC-013, ¶ 7, 137 N.M. 447, 112 P.3d 1104 (internal quotation marks and citation omitted). "Finally, the question of whether a defendant's conduct is unitary is not limited by the [s]tate's legal theory, but rather depends on the elements of the charged offenses and the facts presented at trial." *State v. Contreras*, 2007-NMCA-045, ¶ 21, 141 N.M. 434, 156 P.3d 725 (internal quotation marks and citation omitted). "The proper analytical framework is whether the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." *Franco*, 2005-NMSC-013, ¶ 7 (internal quotation marks and citation omitted).

**{29}** The conduct underlying Defendant's convictions for arson and criminal damage to property was not unitary. Although Defendant's convictions were based on the damage he caused in a single location—his motel room—Defendant's

18

conduct occurred over the span of several hours. Moreover, Defendant's goals for each criminal act were different. As Defendant informed the fire investigator, he "started the fire because he wanted to get the officers out of the room[.]" On the other hand, Defendant broke the mirror in an attempt to prevent the officers from entering the bathroom and disassembled a table for use as a tool to break through the wall into an adjacent room. Defendant's damage to the toilet, and the resulting plumbing and flood damage, also appeared to be guided by an attempt to break through the wall. Finally, the State's legal theory in closing arguments distinguished the damaged property supporting the arson conviction from the damaged property supporting the criminal damage to property conviction. *See Contreras*, 2007-NMCA-045, ¶ 23 (concluding "that [the d]efendant's conduct was not unitary[ g]iven that the [s]tate did not limit its legal theory to the facts constituting [one of the] offense[s] and, to the contrary, provided the jury with sufficiently distinct factual bases upon which it could base [the d]efendant's [two] conviction[s]"). Both criminal acts could therefore reasonably be viewed as stemming from independent factual bases. Concluding the conduct underlying Defendant's convictions for arson and criminal damage was not unitary, we need not reach the second part of our double jeopardy analysis.

**II.    CONCLUSION**

{30}    The judgment and sentence are affirmed.

{31}     **IT IS SO ORDERED.**


                                              _____
                                              **JULIE J. VARGAS, Judge**

**WE CONCUR:**


_____
**J. MILES HANISEE, Judge**


_____
**JENNIFER L. ATTREP, Judge**